*966 OPINION OF THE COURT
Carolyn E. Demarest, J.
Respondent moves to suppress two inculpatory statements made to police during an investigation into the death of respondent’s four-year-old female cousin, for whom respondent was baby-sitting at the time of death.
(1)
Respondent is a diminutive 10-year-old boy who appears younger than his stated age. At the time of the alleged incident, he was residing away from his mother in the home of an aunt and uncle, with whom the deceased also resided. He was initially questioned for approximately 20 minutes by two detectives in a rear bedroom of the family’s apartment sometime between 11:00 and 11:30 p.m. on October 1, 1985. From time to time respondent’s aunt entered the room, though she apparently did not remain, nor did she communicate with respondent. In addition, a third officer, a Sergeant Salmon, was also present intermittently during the questioning. Outside the door to the rear bedroom in which respondent was questioned were two additional officers from the Crime Scene Unit. None of the police officers were in uniform. At no time were weapons drawn.
The threshold issue to be determined is whether respondent was in custody at the time of his initial interrogation so as to entitle him to Miranda warnings prior to questioning. Since no such warnings were timely given, if the questioning of respondent, alone in the rear bedroom of his aunt’s apartment at 11:00 p.m., is found to have been custodial, the statement is presumptively compelled and must be suppressed as made in the absence of a voluntary, knowing, intelligent waiver of respondent’s constitutional rights. (Oregon v Elstad, 470 US 298, 306-307, 317 [1985]; Miranda v Arizona, 384 US 436, 444 [1966].)
The key question in determining "custodial” status in a case like that at bar, where the respondent has not been obviously arrested and restrained or confined, is whether the individual has been "deprived of his freedom of action in any significant way” (Miranda v Arizona, supra, at p 444). The perception of deprivation of liberty is not measured subjectively according to what the particular, possibly guilty, accused thought or had reason to believe at the time of his interrogation, but is measured objectively by what an innocent person would have *967 reasonably believed under the same circumstances. (Matter of Kwok T., 43 NY2d 213, 220 [1977]; People v Yukl, 25 NY2d 585, 589 [1969]; People v Davis, 109 AD2d 846, 847 [2d Dept 1985].) In People v Ward (95 AD2d 351, 353-354 [2d Dept 1983]), it was recognized that the reasonable perceptions of a child must be judged by a standard which takes into account the emotional and intellectual immaturity of a juvenile. Hence, in evaluating the totality of the circumstances surrounding the interrogation of a juvenile to determine whether such interrogation must be deemed "custodial”, the age of the juvenile must be considered a major factor.
Dr. James Wulach, a psychologist with substantial experience in testing and evaluating children as well as adolescents and adults, testified that the average 10-year-old child, under the circumstances of the described back-bedroom questioning by police, would be incapable of perceiving that he had a right to leave the presence of the police or that he could refuse to answer the questions. Dr. Wulach explained: "Rather, he would have perceived such a situation as subjectively coercive, one in which adult authority figures with considerable power were demanding answers that he, if he was to be an obedient child, would have to respond to.”
This court finds petitioner’s attempts to discredit Dr. Wulach’s testimony as prejudiced to be unavailing. Dr. Wulach’s credentials are most impressive and his responses to questions revealed a thoughtful, candid and well-founded analysis. It is noted that no evidence was offered by the prosecution to contradict Dr. Wulach’s expert opinion.
Moreover, this court, in evaluating the totality of the circumstances surrounding the questioning of Chad L. at his aunt’s home at 11:00 p.m. following the discovery of the body of the deceased in the very room in which the questioning took place, concurs in the opinion of Dr. Wulach that the clearly police-dominated situation would have been "subjectively coercive” to any reasonable innocent 10-year-old child. In addition to the intimidating presence of several police officers, both in the room and positioned between the back bedroom and the only exit from the apartment, Chad was isolated from any other person who might have provided moral support. Although his aunt went in and out of the room, she never communicated with Chad, according to the testimony. The door to the bedroom was three quarters closed and Officer Silva admitted that Chad was never told he could leave the room if he wanted to. It is inconceivable to this *968 court that the average, reasonable, innocent 10 year old could have believed, in the circumstances described, that he had any alternative to remaining in the room and answering the questions of the police. (See, People v Garcia, 103 AD2d 753 [2d Dept 1984].) Accordingly, the statement must be suppressed as involuntarily made during a custodial interrogation in violation of respondent’s constitutional rights.
(2)
Detective Luis Silva testified that, following his initial interrogation of respondent and a brief conversation with respondent’s aunt concerning the whereabouts of his mother, he transported respondent and his aunt, together with Detective Narrado and Sergeant Salmon, to the 67th Precinct, where a second statement was taken after Miranda rights were waived by respondent. Respondent moves for suppression of this statement, arguing that it was tainted by the first illegally obtained statement and, further, that his Miranda rights were not knowingly, intelligently and voluntarily waived.
It has recently been determined that a prior custodial statement obtained without Miranda warnings does not, ipso facto, presumptively taint a second statement made following express waiver of Miranda rights. (Oregon v Elstad, 470 US 298, supra.) Nevertheless, in Elstad, the Supreme Court did recognize that the subsequent confession must continue to be evaluated, and may be found to be tainted, notwithstanding Miranda warnings, based upon the totality of the circumstances surrounding the initial illegal interrogation. Where it is determined that the coercive impact of the first inadmissible statement has actually tainted the voluntariness of the second, the second statement must also be suppressed.
According to Detective Silva, the trip to the 67th Precinct took three minutes. While respondent was not "restrained” during this trip, in the car with him were, in addition to his aunt, the three police officers who had just participated in the initial interrogation. Upon arrival at the station house, respondent and his aunt were placed in the ground-floor juvenile room. While he waited for Detective Silva to return, Chad remained in custody, unable to escape the intimidation of police authority. Although he did have an opportunity to speak with his aunt, Norma Jamieson, as he waited alone with her in the juvenile room, it is noted that Ms. Jamieson was also the custodian and caretaker of the deceased and was *969 also related to her by blood. Under such circumstances, at the very least, she had a conflict of interest in supporting and advising respondent and her presence may well have supplemented, rather than alleviated, the intimidation inherent in the situation.*
At approximately 12:40 a.m. of October 2, 1985, almost exactly one hour after the conclusion of the first interrogation at respondent’s residence, Detective Silva began to question respondent again. Detective Silva demonstrated on the witness stand the perfunctory manner in which he read the Miranda warnings verbatim from a small printed card which was admitted into evidence. No other explanation of these rights was offered to respondent and his aunt. The entire Miranda process took no more than two minutes.
Based upon the totality of the circumstances, this court finds no hiatus in the course of the police interrogation of respondent sufficient to dissipate the coercive effect of the initial interrogation and insulate the second statement from the first so as to render it admissible as voluntarily made following Miranda warnings. It is noted that the first statement is not suppressed merely because of a procedural oversight in failing to give Miranda warnings. Rather, this court finds actual coercion in the circumstances surrounding the first statement which render it involuntary as a matter of fact.
Moreover, the proscription against custodial interrogation in the absence of meaningful Miranda warnings is particularly critical in the case of a child as young as Chad, who may well have inferred his own guilt from the circumstances alone, i.e., having been charged with the care of the deceased at the time of her death. While the "cat out of the bag” theory may no longer be viable under Elstad, in the case at bar, Chad’s earlier, clearly coerced, admission may have actually convinced him that he was culpable. In any event, this court finds that both statements were part of a continuous sequence of events pervaded by the coercive presence of the police. In light *970 of these facts, respondent could not have made an independent decision to speak following the Miranda warnings. (See, People v Chapple, 38 NY2d 112 [1975]; People v Bodner, 75 AD2d 440 [4th Dept 1980]; People v Quarles, NYLJ, June 4, 1985, p 13, col 1 [Sup Ct, Queens County].)
The court’s decision to suppress respondent’s second statement does not, however, rest alone upon the taint of the first interrogation. For it is clear that the Miranda rights themselves were not knowingly and intelligently, and therefore not voluntarily, waived.
As previously noted, the rights were read perfunctorily without explanation. The testimony of Dr. Wulach, who was retained specifically for the purpose of evaluating Chad’s capacity to understand and waive Miranda rights, was unequivocal in concluding that Chad did not comprehend these rights at the time they were read to him. Indeed, Dr. Wulach indicated that no average 10 year old could be expected to appreciate Miranda warnings given literally in the manner given to respondent.
This court need not, and does not, find that no 10 year old can ever intelligently and voluntarily waive his Miranda rights. It is clear from Dr. Wulach’s testimony that, with proper explication of the substance of his constitutional rights, respondent would have been able to understand the functional essence of the Miranda warnings and make an informed decision. There was much argument at trial as to the respondent’s ability to appreciate the philosophical concept of a "right”. Such intellectual sophistication is not essential to a meaningful waiver. (People v Williams, 62 NY2d 285 [1984].) The average adult may not be capable of articulating the legal concept of a "right”, but that does not preclude the ability to comprehend that one may decline to speak to police with impunity or may demand to be assisted by an attorney. The essence of a meaningful waiver is merely the awareness and understanding of such alternatives and the opportunity to make a choice.
The evidence established beyond any doubt that, at the time of questioning, Chad did not understand the alternatives and could not, therefore, have made an intelligent choice to speak. (See, Matter of Karen XX., 85 AD2d 773 [3d Dept 1981].) Accordingly, the second statement is also suppressed.

 The court does not find, however, as suggested by respondent, that the police violated Family Court Act § 305.2 (3), (4) in failing to locate respondent’s mother prior to questioning. Detective Silva had every reason to believe that Ms. Jamieson was the person legally responsible for Chad, as well as the person with whom he resided, and certainly had no reasonable expectation that Chad’s mother could be located promptly. The presence of Ms. Jamieson at the station house adequately fulfilled the purpose of Family Court Act § 305.2 (3), (4).