*520 OPINION OF THE COURT
Paula J. Hepner, J.
Respondent filed an omnibus motion pursuant to sections 330.2, 332.1 (7) and section 332.2 of the Family Court Act seeking suppression (People v Huntley, 15 NY2d 72 [1965]) of a statement given by the respondent on the grounds that it was involuntarily made, without a knowing and intelligent waiver of the rights enunciated in Miranda v Arizona (384 US 436 [1966]). Respondent’s challenge is based upon his mother’s inability to serve as his adult representative and to exercise his constitutional rights due to a conflict of interest: (a) because the victim is Ms. L.’s daughter and the respondent is her son, she cannot protect her daughter’s rights without simultaneously jeopardizing her son’s rights, and (b) since Ms. L. was the subject of a child welfare investigation, she could not assert the respondent’s rights without jeopardizing her own.
Findings of Fact
Around 6:45 p.m. two police officers came to the respondent’s home and informed his mother that they received a report of sexual abuse. Ms. L. admitted the officers to her home. They spoke with her and her daughter, Deena, in the living room. The respondent came out of his room. One of the police officers asked if he could take the respondent into another room to speak with him. Ms. L. did not object. The officer took the respondent into the mother’s bedroom. Ms. L. could not hear what they were saying. Thereafter the officers told Ms. L. she and her son would have to go to the Child Advocacy Center to be interviewed by the sex abuse squad and they drove her and her children to the Center.
About 9:00 p.m. on December 14, 2001 Detective John Fox of the sex abuse squad at the Child Advocacy Center was assigned to investigate the case of alleged sex abuse between the respondent and his eight-year-old sister. When they arrived at the Child Advocacy Center, Detective Fox seated the respondent in the juvenile interview room and then spoke with Ms. L. and her daughter. When Detective Fox returned from interviewing Deena, he told Ms. L. that “he believed her.” Ms. L. testified that her immediate thought was that she would be charged with neglect and the children removed because she knew Deena said to the school authorities that she told her mother of the abuse and nothing was done about it.
At 11:45 p.m. Detective Fox brought Ms. L. into the juvenile room. Also present was a caseworker from the Administration *521 for Children’s Services (hereinafter ACS) because a report of suspected child abuse and/or maltreatment had been made to the State Central Registry. Detective Fox introduced the ACS caseworker to Ms. L. but did not tell her why the caseworker was there.
Based on Deena’s statements, Detective Fox placed the respondent under arrest and read the six Miranda warnings to him and his mother from a preprinted sheet of paper. At the conclusion of each warning, when Ms. L. and the respondent answered affirmatively to signify their understanding, Detective Fox wrote “yes” in the space provided on the warnings sheet to record their reply. Then the respondent and his mother signed the warnings sheet. At no time did the respondent or his mother request an attorney, ask to stop the questioning, ask for clarification of any of the warnings, or assert his Fifth Amendment privilege against self-incrimination. As the rights were being read, Ms. L. testified she was thinking she was “about to lose her children” and she “wanted to cooperate with him to make this proceeding, wherever it is, going [sic] smoothly as possible * * * because I didn’t want him to take my children away from me.”*
When Detective Fox completed the warnings he interviewed the respondent for 15 minutes. He began by telling the respondent why he was at the Child Advocacy Center and that he had spoken to Deena. Detective Fox told the respondent what his sister said and commented that he believed her. Then he told the respondent he should tell him the truth. When the respondent “didn’t answer right there,” Ms. L. said “Omar, you need to tell us what happened. You need to tell the truth.” Detective Fox said to the respondent, “your mother is asking you to tell the truth; she wants to know what happened.”
The respondent’s mother was upset with her son and told him, “your father failed the both of you as a father and, you are the only male figure in the house at this point, and how could you do something like this to your sister.” Ms. L. got up from her chair and began to pace around the room. She said to the respondent, “you know, of all things, I don’t expect something like this.” The respondent said, “okay let me tell. It didn’t happen that way, the way Deena said.” Upon hearing this, Ms. L. became mad and shouted to her son, “Omar, stop lying, stop lying. Just tell the truth.” At that point, Ms. L. said *522 she “took over from the detective because [she] was just interested to hear what happened.” She became “very aggressive with Omar,” and told him to tell the truth “so we could just deal with this situation.” At one point Detective Fox looked at Ms. L. but she said she “didn’t care if he [thought she] was doing his job.”
When she stopped talking, the respondent began to speak and the detective began to ask him questions. As the respondent spoke, Ms. L. stood to the left side of the detective with her hands folded, listening to what the respondent was saying. In all, Ms. L. said that she admonished her son at least three times to tell her the truth.
When the interview concluded, Detective Fox told the respondent his sister was disappointed with him and that he should write her a letter of apology. Detective Fox left the room and Ms. L. remained to speak with the ACS caseworker, whom she then learned was involved in the case because of the possibility of parental neglect. They spoke for 10 minutes and then Ms. L. returned to the waiting room where Deena was sitting. Detective Fox told her they were going to hold the respondent overnight but that she and her daughter could go home. Ms. L. asked to see her son. They returned to the interview room and the letter the respondent wrote was on the table in front of him. Ms. L. asked to see the letter and Detective Fox showed it to her. The ACS caseworker arranged transportation for Ms. L. and Deena. They arrived home around 2:00 a.m. Forty-five minutes passed from the giving of the Miranda warnings to the completion of the written statement.
Conclusions of Law
At a Huntley hearing, the People have the burden of proving, beyond a reasonable doubt, that a statement was voluntarily made (People v Huntley, 15 NY2d at 78). If the statement was made during a custodial interrogation, the presentment agency has the burden of showing that the respondent knowingly and intelligently waived those constitutional rights enunciated under Miranda. The purpose of the Miranda rule is to counteract the coercive pressure of the custodial setting; therefore, those rights apply only to custodial interrogations (People v Deary, 212 AD2d 960 [4th Dept 1995], lv denied 85 NY2d 971 [1995]; Matter of Darryl T., 210 AD2d 120 [1st Dept 1994], lv denied 85 NY2d 954 [1995]). Absent such a showing the exclusionary rule, a judicially created tool to deter illegal *523 conduct and practices of law enforcement officials, requires suppression of the evidence (Mapp v Ohio, 367 US 643 [1961]). In New York, the voluntariness of a statement is a question of fact to be determined from the totality of the circumstances.
There is no dispute that the respondent was a suspect, that the questioning at the Child Advocacy Center was custodial, and that Miranda warnings were required and administered. In regard to the oral and written statements given by the respondent at the Brooklyn Child Advocacy Center, the custodial interrogation took place"2XA hours after the respondent was brought to the Center on the evening of December 14, 2001. Both the respondent and his mother were given the formal warnings required by Miranda and section 305.2 (7) of the Family Court Act. The oral and written statements were made by the respondent after he and his mother knowingly and intelligently waived these rights.
The legal analysis of the Law Guardian’s challenge begins with the language of Family Court Act § 305.2 (3) which provides that when an officer takes a minor into custody, “he shall immediately notify the parent or other person legally responsible for the child’s care, or if such legally responsible person is unavailable the person with whom the child resides, that the child has been taken into custody.” Implicit in these provisions, as Professor Sobie notes in the commentaries to section 305.2, is the assumption that “the adult notified will act in the juvenile’s interest.” (Sobie, Practice Commentaries, McKinney’s Cons Laws of NY, Book 29A, Family Ct Act § 305.2, at 68.) It also presumes an existing parent/child relationship based on regular contact with the child, involvement in the child’s life, mutual respect, and open lines of communication. In a case where a noncustodial father, whom the child characterized as “non-supportive,” served as the respondent’s guardian while the police questioned her, the Third Department held that requiring the police to ascertain “the nature and extent of the parental relationship with the juvenile offender in order to determine whether it is sufficiently supportive, a wholly subjective determination, clearly would place an impossible burden on law enforcement” (People v Gardner, 257 AD2d 675, 676 [3d Dept 1999], lv denied 93 NY2d 924 [1999]).
A small body of case law has considered situations questioning whether the interests of the person notified and appearing on behalf of a child during police interrogations may diverge from the interests of the child, for example: where the person *524 is the administrator of the residential school where the fire was set and killed another student (People v Alaire, 148 AD2d 731 [2d Dept 1989]); where the person is the mother of the complainant (Matter of James OO., 234 AD2d 822 [3d Dept 1996], lv denied 89 NY2d 812 [1997]); where the person is the school administrator and also the complainant (Matter of Candy M., 142 Misc 2d 718 [Fam Ct, Ulster County 1989]); where the person is the relative, caretaker and custodian of the deceased victim (Matter of Chad L., 131 Misc 2d 965 [Fam Ct, Kings County 1986], affd 131 AD2d 760 [2d Dept 1987]); where the person may have possessed property stolen by the juvenile during the larceny for which the child was arrested (People v Barnes, 124 AD2d 973 [4th Dept 1986], lv denied 69 NY2d 743 [1987]); where the person is the principal of the school where the burglary occurred and property was damaged by the child (People v Benedict V., 85 AD2d 747 [2d Dept 1981]); where that person is the intended victim of the juvenile’s alleged acts (People v Susan H., 124 Misc 2d 341 [Sup Ct, Bronx County 1984]); and where the person is the son of the juvenile’s murder victim (Matter of Michelet P. v Gold, 70 AD2d 68 [2d Dept 1979]). In these cases, only the third-party parental substitutes were disqualified from fulfilling the parental function because of a conflict of interest.
Of these cases James OO. presents a factually similar situation. In that case, the respondent was charged with sexually abusing his younger sister. The police notified the mother and she was present when the officer gave her son the Miranda warnings. The Third Department held that “the dual role of respondent’s mother as the ‘accuser’ and the parent present during the police questioning of respondent is a factor to be considered, along with all of the other circumstances, in resolving the factual issue of the voluntariness of the respondent’s statement” (James OO., 234 AD2d at 823). Characterizing her as “play[ing] a largely passive role after consenting to the police officer’s questioning of respondent,” the Court found there was no evidence that she engaged in any conduct that could have affected the voluntariness of the respondent’s statement. (Id.)
The purpose in having a parent present during custodial interrogations is twofold: to help a respondent understand what the Miranda warnings mean and exercise them either before the questioning begins or at some point later on, and, if the rights are waived, to monitor the interrogation process so the police do not engage in coercive or deceptive tactics. In *525 James OO. the Third Department considered the behavior of the parent during the interview as a factor in deciding voluntariness. On its face the holding of James OO. could be interpreted to mean that parents who are, by nature, outspoken, quick tempered, excitable, domineering, aggressive, controlling, or emotional during the interrogation process are not suitable protectors of their children’s rights whereas parents whose temperaments incline them to be reserved, passive, timid, nonassertive, submissive, or nonconfrontational, are. If courts are to judge whether a parent can protect a child’s rights solely by looking at the parent’s demeanor, without reference to its context, then only passive parents will be found suitable to fulfill the parental function.
The respondent points to four factors which he claims deprived him of access to a “supportive adult”: the conduct of the mother during the interrogation, the conflict inherent in Ms. L.’s dual role as mother of the victim and perpetrator, the child abuse/neglect investigation of the mother, and Ms. L.’s failure to comprehend the significance of the warnings when they were read to her. Based on a totality of the evidence, the court does not find the respondent’s statement was involuntarily made.
The testimony clearly shows that the respondent’s mother did not assume a “largely passive role” after the warnings were administered. Ms. L. displayed all of the emotions that an involved and concerned parent of a certain personality type would exhibit in circumstances such as these. She had just come from a conference at her daughter’s school where she first learned of the allegations. As she sat both of her children down in her home to find out what was going on, the police arrived and interrupted them. When she came to the Child Advocacy Center she was distraught, upset, angry and disappointed in her son. While they sat in the waiting room, she tried again to talk with her son, telling him, “this looks like it is getting serious so you need to tell me exactly what-happened.”
This court believes the only meaningful interpretation of the holding in James OO. is that parental conduct should be assessed to determine what motivates it. Parental conduct is a relevant factor in deciding voluntariness when the parent’s behavior is precipitated or influenced by law enforcement officials and becomes “so pervaded by governmental involvement that it [loses] its character as a [private individual act]” (People v Lewis, 273 AD2d 254 [2d Dept 2000], lv denied 95 NY2d 891 *526 [2000]). The record does not contain any evidence to show that Ms. L. “took over the Detective’s job” at the suggestion or direction of the police or under duress. From the record her conduct was initiated wholly by herself and motivated solely by her own temperament.
Ms. L. recognized she was serving in a dual role, as protector of her son as well as her daughter, when she said she was “caught between [her] two children.” As the case law cited above demonstrates, that recognition alone does not deprive a parent of the objectivity required to perform each function. Parents are called upon to protect and defend multiple children at the same time whenever they settle sibling squabbles and playground fights.
The evidence shows the respondent’s mother was the subject of a child abuse or maltreatment investigation. Admittedly, she was worried about the fate of both of her children and her family, but the record does not show that either the police or the ACS caseworker sought to capitalize on Ms. L.’s fears or her vulnerability by threatening to bring her to court on charges of abuse or neglect if she did not get her son to talk. Neither does the record show that at the time the warnings were administered, Ms. L. had any awareness that she was the subject of any such investigation. While Ms. L. had her own suspicions that she might be considered neglectful, she did not learn of the caseworker’s purpose or function until Detective Fox’s interrogation of her son was over. Moreover, it would not be in the mother’s interest to have her son admit to the acts alleged in order to have the abuse/neglect charges dropped against her. On the contrary, any admission by the respondent would most likely increase the probability of a child protective case being filed against her and the possibility of having the children removed. Therefore the mother would not have a conflict of interest in asserting the respondent’s rights to remain silent, to refuse to answer questions or to have an attorney present to advise him.
Finally, the respondent’s mother testified she did not pay attention to the warnings when they were read and said she did not understand their full import until Detective Fox testified in this hearing. This court does not find this testimony credible because of the obvious level of sophistication and intellectual acumen Ms. L. has.
Decision
The presentment agency has met its burden of showing, beyond a reasonable doubt, that the respondent’s statement was *527 made after a knowing, voluntary and intelligent waiver of his rights. The respondent has not demonstrated that either the oral or written statement made at the Child Advocacy Center was the result of improper police tactics or strategies nor were they taken in violation of his constitutional rights. Accordingly, the motion to suppress the respondent’s oral and written statements is denied.
[Portions of opinion omitted for purposes of publication.]

 All quotations are to the transcript of March 20, 2002. Citations are omitted for_publication purposes.