**COMMONWEALTH of Kentucky,**
**Appellant,**

v.

**Hon. T. Bruce BELL; and T.C., A**
**Child Under Eighteen Years**
**of Age, Appellee.**

No. 2011–CA–000562–ME.

Court of Appeals of Kentucky.

March 30, 2012.

Jason Rothrock, Lexington, KY, for appellant.

Renee Vandenwallbake, Assistant Public Advocate, Frankfort, KY, for appellee.

Before ACREE, MOORE and VANMETER, Judges.

## OPINION

ACREE, Judge:

The Commonwealth appeals an order of the Fayette Circuit Court denying its petition for a writ of prohibition. The issue underlying the Commonwealth's writ petition is whether the Fayette District Court properly granted Appellee T.C.'s motion to suppress his oral confession on the basis that it was given involuntarily. Following a careful review, we affirm.

### I. *Facts and Procedure*

Over his summer break from school, T.C., a thirteen-year-old boy, was charged with first-degree sodomy of another person less than twelve years old in violation of Kentucky Revised Statute (KRS) 510.070(1)(b). The charge was that T.C. engaged in anal intercourse with his six-year-old cousin in the shower.

Before that summer break, on May 19, 2010, Detectives Johnson and Ball had school officials remove T.C. from his middle school classroom and brought to a separate room to be interrogated. T.C.'s parents were not notified prior to the interview. No other adults were present in the room.

Before beginning questioning, Detective Johnson read T.C. his rights pursuant to *Miranda v. Arizona.*[1] He told T.C. he was not under arrest and that if he was honest and truthful, everything would be alright. Detective Johnson explained that he wanted to talk to T.C. about an incident involving T.C.'s cousin. Detective Johnson spent some time explaining to T.C. that thirteen-year-old boys "have a lot of hormones," and sometimes get "horny" and "get a little bit curious." Detective Johnson then asked what happened in the shower with T.C.'s cousin. Initially, T.C. stated nothing happened in the shower; they just washed up after playing outside in the mud. Detective Johnson responded, "I know what happened in the shower. I just want you to be honest with me." Detective Johnson informed T.C. that his cousin claimed he was "bent over and [T.C.'s] penis went in [his cousin's] butt." When T.C. denied his cousin's version of the events, insisting nothing happened, Detective Johnson responded "something else happened in that shower. I really can't leave here until I find out if this is something that was an accident or something that was done intentionally." T.C. then claimed that his cousin was playing in the shower and fell back onto T.C.; T.C. stated his penis did not go in his cousin's butt, just around it when his cousin fell.

1. 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Detective Johnson then asked T.C. several times if he "was curious to see what it felt like." T.C. responded no, explaining it was an accident. Detective Johnson then affirmatively stated, "It did go in. Let's just put it this way [T.C.], it went in his butt. I know that. Your penis went in his butt.... Tell me why you did that." T.C. repeatedly denied Detective Johnson's statement, again claiming it was an accident that happened when his cousin fell.

Unsatisfied, Detective Johnson began offering possible scenarios, stating "you did it because you were either curious or you did it because you were messing around, poking at him." T.C. then changed his story slightly, stating he and his cousin were wrestling in the shower and, while wrestling, his penis might have penetrated his cousin's butt.

At this point, Detective Johnson began questioning T.C. about why this occurred, stating, "the one thing I gotta break through here is why you did it. You gotta tell me that honestly. You gotta be honest. We can be done here." T.C. interrupted Detective Johnson, again stating "it was an accident. I didn't do it on purpose." Detective Johnson repeatedly asked T.C. why he told his cousin not to tell about the shower incident. T.C. explained that, while wrestling, he accidently hit his cousin and that is when he told his cousin not to tell.

The detective concluded the interrogation as to the sodomy allegations by stating, "you did it because you were horny, had a hard on, and you were curious.... Am I right?" T.C. responded, "yes sir." Detectives Johnson and Ball then engaged in a brief discussion with T.C. concerning whether T.C. had himself been, or currently was, a victim of sexual abuse; T.C. responded in the negative. At the conclu-

sion of the interrogation, T.C. was allowed to return to class.

After T.C. told his father (Father) about the incident, Father called police headquarters and, on June 3, 2010, went to police headquarters to pick up pleadings charging T.C. with first-degree sodomy. T.C. filed a motion to suppress his statements on the ground that the detective violated the parental notification statute, KRS 610.200, by failing to notify T.C.'s parents prior to the interview.

At the December 7, 2010 suppression hearing, Detective Johnson mistakenly testified that he interviewed T.C. on June 3rd at police headquarters when T.C.'s father brought him there. He also testified that he spoke with T.C. at school on May 19, 2010, but adamantly denied discussing the sodomy allegations. Rather, Detective Johnson testified that the purpose of the May 19th interview was to ascertain whether T.C. himself was being sexually abused.[2] Detective Johnson also testified that the school interview was not recorded.

T.C. disputed Detective Johnson's testimony, claiming the interrogation occurred at Morton Middle School on May 19th without parental notification. On cross-examination, Detective Johnson repeated that he "didn't approach [the sodomy allegations] with [T.C.]" on May 19th and no recording of the school interview was made. To further refute Detective Johnson's testimony, Father testified. Father confirmed he was not told about the May 19th interview beforehand. Father testified that, after that interview, T.C. was upset and Father had to calm T.C. down. In discussing the interview, T.C. told Father that Detective Johnson talked to him "real nice" and claimed, if T.C. told the truth, he would not be arrested. Father

---

**2.** The record contains references to the detectives' suspicion that T.C.'s father was sexually abusing T.C., but nothing in the record indicates more than a suspicion.

also testified that T.C. told him that Detective Johnson, during the interview, had a tape recorder that he turned on and off. Father affirmed that he was "100%" sure he never took T.C. to police headquarters and, to Father's knowledge, T.C. was never interviewed at police headquarters. After this testimony, defense counsel moved for a continuance which was granted.

The suppression hearing resumed on December 21, 2010. The Commonwealth immediately conceded Detective Johnson's interview of T.C. occurred on May 19th at Morton Middle School prior to notifying T.C.'s parents. The Commonwealth argued T.C.'s statements were, nonetheless, admissible because T.C. was not in custody; therefore, the parental notification statute was not triggered. The district court rejected the Commonwealth's position, finding T.C. was in custody and, pursuant to KRS 610.200, Detective Johnson was obligated to notify T.C.'s parents prior to interviewing T.C. In reaching this conclusion, the district court expressed concern regarding the accuracy of Detective Johnson's testimony noting: "I think … there is obviously some misleading going on here." In the court's words, the detective "told a couple different stories" and this called into question "what really happened" during his interview of T.C. on May 19th.

The Commonwealth filed a timely motion to re-consider, again arguing T.C. was not in custody, the parental notification statute did not apply, and even if it did apply, suppression was not automatically required because T.C. was *Mirandized* and his statements given voluntarily. T.C. opposed the motion.

The district court held a hearing on January 18, 2011. To his credit, Detective Johnson previously informed the district court that he had made a mistake in his testimony regarding the circumstances of his interrogation of T.C. The district court informed the parties that until the detective made that admission, he was inclined to believe the misleading testimony. The court was then able to listen to the entire audio recording of the May 19th interrogation of T.C.[3]

The district court granted the Commonwealth's motion to re-consider, finding that KRS 610.200 was not violated because T.C. was not in custody.[4] However, the district court left intact its ultimate suppression of T.C.'s statements explaining that, even if T.C. was not in custody, his statements were not admissible because, based on the totality of the circumstances, they were not voluntary. In so finding, the district court clarified that it relied upon Detective Johnson's inconsistent testimony, T.C.'s age at the time of the statement, T.C.'s mental capacity which the district court described as "not mentally disabled, but … not a straight-A student either," the lack of a parental presence during the interview, and the nature of the interrogation itself, as evidenced by the audio recording.

The Commonwealth then filed a Petition for Writ in Fayette Circuit Court, to prohibit the district court from suppressing T.C.'s statement. The circuit court denied the petition. The Commonwealth promptly appealed.

## II. *Standard of Review*

██ In *Commonwealth v. Peters*, 353 S.W.3d 592 (Ky.2011), our Supreme Court

---

3. Apparently, the audio recording was attached as an exhibit to the Commonwealth's motion to re-consider and, for the first time, was made available to the district court.

4. T.C. objected to the ruling that he was not in custody, but failed to challenge it in this Court by filing a cross-appeal; therefore, we cannot express our opinion that he was—or was not—in custody.

concisely set forth the standard to be used when reviewing an appellate court's grant or a denial of a writ of prohibition, explaining:

> [w]hether to grant or deny a writ of prohibition is within the sound discretion of the court with which the petition is filed. *Haight v. Williamson*, 833 S.W.2d 821, 823 (Ky.1992). Thus, this decision is ultimately reviewed by an appellate court for abuse of discretion. However, if the basis for the grant or denial involves a question of law, the appellate court reviews this conclusion *de novo*. *Rehm v. Clayton*, 132 S.W.3d 864, 866 (Ky.2004). If the court with which the petition is filed bases its ruling on a factual determination, this finding of fact is reviewed for clear error. *Grange* [*Mut. Ins. Co. v. Trude*], 151 S.W.3d [803] at 810 [ (Ky.2004) ].

*Peters*, 353 S.W.3d at 595. With this standard in mind, we turn to the Commonwealth's contention that the circuit court erred in denying its petition.

### III.  *Analysis*

#### A.  *Prerequisites for the Grant of a Writ of Prohibition*

■■■ "A writ of prohibition or mandamus is an extraordinary form of relief and should not freely be granted." *Riley v. Gibson*, 338 S.W.3d 230, 233 (Ky.2011). The decision to issue a writ, however, rests within the sound discretion of the court with which the petition is filed. *Hoskins v. Maricle*, 150 S.W.3d 1, 9 (Ky.2004). A writ

> may be granted upon showing that (1) the lower court is proceeding or is about to proceed outside of its jurisdiction and there is no remedy through an application to an intermediate court; or (2) that the lower court is acting or is about to act erroneously, although within its jurisdiction, and there exists no adequate

remedy by appeal or otherwise and great injustice and irreparable injury will result if the petition is not granted.

*Mahoney v. McDonald–Burkman*, 320 S.W.3d 75, 77 (Ky.2010) (citation omitted).

■■■ Here, the Commonwealth asserts the district court acted within its jurisdiction, but erroneously—the second category of writs. Analysis under this category prohibits consideration of the merits unless the petitioner first clears the "hurdle" of establishing that he has no adequate remedy by appeal and will suffer great and irreparable injury if error has been committed and the petition denied. *Gilbert v. McDonald–Burkman*, 320 S.W.3d 79, 84 (Ky.2010); *Hoskins*, 150 S.W.3d at 18 ("[O]nly after determining that the prerequisites exist will the court decide whether an error occurred for which a writ should issue."); *Bender v. Eaton*, 343 S.W.2d 799, 801 (Ky.1961) ("This is a practical and convenient formula for determining, *prior to deciding the issue of alleged error*, if petitioner may avail himself of this remedy."). The Commonwealth cleared this hurdle.

#### 1.  *Inadequate Remedy by Appeal*

■■■ Once T.C.'s statement was suppressed, the Commonwealth had two options: (1) proceed to trial anyway, or (2) seek review of the district court's interlocutory suppression order. In *Commonwealth v. Williams*, 995 S.W.2d 400 (Ky. App.1999), this Court noted that "KRS 23A.080, the statute addressing appeals from district court to circuit court, makes no provision for interlocutory appeals." *Id.* at 402; *cf.* KRS 22A.020 (providing for certain interlocutory appeals by the Commonwealth from the *circuit court* to the *court of appeals*, but not from *district court* to *circuit court* ). Nonetheless, relying on the reasoning in *Tipton v. Commonwealth*, 770 S.W.2d 239 (Ky.App.1989)

*abrogated in part on other grounds by Hoskins*, 150 S.W.3d at 10, the Court explained that "some avenue of relief should be open for review of interlocutory district court rulings." *Id.* at 403. We concluded in *Williams* that "the Commonwealth's only vehicle for review of [a] district court's [interlocutory] ruling was an original action in circuit court seeking prohibition." *Id.* at 403.

Furthermore, if the Commonwealth elected to try this case without the suppressed evidence, then upon an acquittal it would be constitutionally prohibited from seeking appellate review of the suppression order. KY. CONST. § 115 ("[T]he Commonwealth may not appeal from a judgment of acquittal in a criminal case[.]"); *see also Ballard v. Commonwealth*, 320 S.W.3d 69, 72 (Ky.2010). In sum, we agree there is no adequate remedy by appeal if the district court is indeed acting erroneously. *Peters*, 353 S.W.3d at 595.

### 2. Great Injustice and Irreparable Injury

■ "[G]reat injustice and irreparable injury" is something "of a ruinous nature[,]" *Bender*, 343 S.W.2d at 801; that is, some "incalculable damage to the applicant ... either to the liberty of his person, or to his property rights, or other far-reaching and conjectural consequences." *Litteral v. Woods*, 223 Ky. 582, 4 S.W.2d 395, 397 (1928).

■ As this Court recognized in *Tipton*, and reiterated in *Williams*, "this form of interlocutory review is available from district court rulings [because,] '[o]therwise, the Commonwealth may be forced to trial without vital evidence or with some other significant prejudice to its case....'" *Williams*, 995 S.W.2d at 404 (citing *Tipton*, 770 S.W.2d at 241). The "great injustice" and "harm" afforded the Commonwealth by proceeding to trial

without crucial evidence cannot be undone. Accordingly we are persuaded the Commonwealth would suffer great and irreparable injury if the district court erred in suppressing T.C.'s statements.

### B. Review of the order suppressing T.C.'s statement

■ The burden was on the Commonwealth to prove to the district court, by a preponderance of the evidence, that the defendant's statements were voluntary. *Stanton v. Commonwealth*, 349 S.W.3d 914, 917 (Ky.2011). The Commonwealth was required to show, based on the totality of the circumstances, that the investigating detectives did nothing to break or override T.C.'s will, *Chambers v. Florida*, 309 U.S. 227, 240, 60 S.Ct. 472, 84 L.Ed. 716 (1940), and that his statements were "the product of a rational intellect and a free will," *Blackburn v. Alabama*, 361 U.S. 199, 208, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960). The district court assessed the Commonwealth's claim of voluntariness by considering the totality of the surrounding circumstances, including the details of the interrogation and the characteristics of the defendant, T.C., and by asking whether the confession resulted from overreaching by the interrogators or from T.C.'s own properly elicited choice. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973).

■ On appeal, we defer, absent clear error, to the trial court's findings of fact with respect to the surrounding circumstances. However, the ultimate voluntariness determination is a question of law; therefore, we review that determination *de novo*. *Stanton*, 349 S.W.3d at 917 (citing *Miller v. Fenton*, 474 U.S. 104, 110, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985)).

■ First, we find no clear error in the district court's fact-finding. While

confusion initially prevailed concerning the date, location, and substance of Detective Johnson's interrogation of T.C., that confusion was eliminated by the detective's subsequent candor and the Commonwealth's acquiescence. The district court then listened to the entire audio recording of T.C.'s statement and neither party disputed the recording's authenticity. However, the district court found that Detective Johnson's actual independent recollection of the events offered through his testimony at the December 7th hearing was inconsistent, mistaken and, consequently, misleading, albeit unintentionally so. As a result, the district court assigned the detective's testimony little, if any, weight. We are required to "give due weight to the assessment by the trial court of the credibility of the officer and the reasonableness of the inferences." *Commonwealth v. Whitmore*, 92 S.W.3d 76, 79 (Ky.2002). This Court has closely examined the record, including the audio recordings of the suppression hearings and of T.C.'s interrogation, and we find no error in the district court's factual findings.

Next, we undergo a *de novo* review of the law as applied to those facts. As framed by the Commonwealth, the sole issue before this Court is the voluntariness of T.C.'s statements to Detective Johnson. The Commonwealth argues that T.C.'s statement cannot be involuntary because the record fails to support any finding of coercion by the detectives.

The Commonwealth is correct that voluntariness turns on "the presence or absence of coercive police activity." *Bailey v. Commonwealth*, 194 S.W.3d 296, 300 (Ky.2006). In that regard, the "U.S. Supreme Court has described the 'ultimate test' of the voluntariness of a confession as follows: 'Is the confession the product of an essentially free and unconstrained choice by its maker?'" *Id.* (citation omitted).

In examining voluntariness, "both the characteristics of the accused and the details of the interrogation are considered." *Schneckloth*, 412 U.S. at 226, 93 S.Ct. at 2047, 36 L.Ed.2d at 862. With respect to the characteristics of the accused, "reviewing courts consider such factors as age, education, intelligence, and linguistic ability." *Bailey*, 194 S.W.3d at 300. "Factors relevant to a characterization of the interrogation include the length of detention, the lack of any advice to the accused concerning his constitutional rights, the repeated or prolonged nature of the questioning, and the use of overtly coercive techniques such as the deprivation of food or sleep, or the use of humiliating tactics." *Id.* Of course, "[u]se of a totality of the circumstances analysis embodies this belief that voluntariness cannot '[turn] on the presence or absence of a single controlling criterion' but rather a 'careful scrutiny of all the surrounding circumstances.'" *Id.* at 302.

As correctly pointed out by the Commonwealth, the detectives did not deprive T.C. of food or sleep, and used a calm, conversational tone throughout the interview. They also read T.C. his *Miranda* rights and said he was not under arrest.

These latter statements may serve to assure an adult, or even a mature minor, that he should feel free of coercion, that he is free to say nothing and even to leave the officers' presence any time he desires. However, we do not believe they provided that same assurance, under these circumstances, to this thirteen-year-old boy.

A school is not designed or intended to create a coercive environment in which a child's will is entirely subjugated. However, a school shares few of the protective or comforting characteristics a child naturally associates with his home. The fact is a school is where compliance with adult au-

thority is required and where such compliance is compelled almost exclusively by the force of authority. Like it or not, that is the definition of coercion. Every student is expected to be, and to stay, where school authorities place him, be it in a classroom, or gymnasium, or cafeteria, or study hall. If he is sent to the principal's office, he is not allowed to leave until the principal says so. And if he is instructed to be alone in a room with police detectives, as T.C. was, how can we expect him to believe some other set of rules applies? Can we reasonably expect a thirteen-year-old child to perceive he has *greater* freedom while in school simply because he was read his *Miranda* rights? When the detective said, "I really can't leave here until I find out" something, is it reasonable to believe T.C. did not feel coerced into saying *something*, whether true or not; is it reasonable that he believed *he* had the right to say nothing or to get up and leave the detective there alone? We believe not.

Although the thirty-two minute interrogation may not seem excessive, the repetitive questioning amounted to coercion by importunity.[5] T.C., alone, was ordered by school officials into a room, facing adult authority figures with considerable power, who also feigned superior knowledge ("I know what happened [and your cousin] has not lied to me about anything"), and who repeatedly demanded answers that he, if he was to be an obedient child, would have to provide. How could T.C. not perceive such a situation as subjectively coercive? [W]hen, as here, a mere child—an easy victim of the law—is before us, special care in scrutinizing the record must be used. Age 15 [two years older than T.C.] is a tender and difficult age for a boy of any race. He cannot be judged by the more exacting standards of maturity. That which would leave a man cold and unimpressed can overawe and over-

whelm a lad in his early teens. This is the period of great instability which the crisis of adolescence produces. *Haley v. Ohio*, 332 U.S. 596, 599, 68 S.Ct. 302, 303–04, 92 L.Ed. 224 (1948); *see also Matter of Chad L.*, 131 Misc.2d 965, 502 N.Y.S.2d 910, 912–13 (N.Y.Fam.Ct.1986) (finding statement of 10–year–old boy involuntary even though questioning took place in home of aunt who was in room during portions of interrogation).

■ T.C. was an impressionable youth inclined to acquiesce to coercive police tactics. We do not condemn these tactics in all circumstances. However, when a person of limited mental ability and of an impressionable age is "questioned without the aid of counsel, issues of suggestibility and possible overreaching are raised ... and must be factored into a consideration of the totality of the circumstances." *Bailey*, 194 S.W.3d at 302 (citation omitted). In sum, viewing the interrogation through the lens of this thirteen-year-old student, under these circumstances, we are persuaded the district court did not err in finding T.C.'s statements to Detective Johnson "were not the product of [his] free choice" when given. *Henson v. Commonwealth*, 20 S.W.3d 466, 469 (Ky.1999). Accordingly, we find the district court did not act erroneously by granting T.C.'s motion to suppress his statements to Detective Johnson.

### III. *Conclusion*

The Fayette Circuit Court's February 25, 2011 order denying the Commonwealth's petition for a writ of prohibition is affirmed.

ALL CONCUR.

---

5. T.C. confessed after thirty-two minutes, making a longer interrogation unnecessary.