Filed 10/16/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re T.F., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>T.F.,<br><br>        Defendant and Appellant. | A144085<br><br>(Contra Costa County<br>Super. Ct. No. J1300607) |

In this appeal, we review the prosecution of an adolescent for committing a lewd act when he was 13 years old. T.F., who was a minor at all times relevant to the case, appeals from the juvenile court's jurisdiction and disposition orders issued in a wardship proceeding under Welfare and Institutions Code section 602. Prior to and again at the jurisdictional hearing, defense counsel moved to exclude inculpatory statements appellant made to the police on the ground the appellant did not waive his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). After a three-day hearing, the court suppressed the pre-*Miranda* statements T.F. made when questioned at his school, but admitted the post-*Miranda* statements he made at the police station. The court sustained the petition, finding true the allegation that T.F. had engaged in lewd and lascivious conduct in violation of Penal Code section 288, subdivision (a) by touching E.C.'s vagina when she

1

was three years old. T.F., who was then 16 years old, was declared a ward of the court and placed on probation in his mother's home.

T.F. claims his statements were made in violation of his Fifth Amendment right against self-incrimination. Contending the statements were erroneously received in evidence and cannot be considered harmless, he maintains the judgment must be reversed. We agree.[1]

## BACKGROUND

In June 2013, the Contra Costa County District Attorney filed a wardship petition, alleging one count of possessing a weapon on school grounds.[2] (Pen. Code, § 626.10, subd. (a).) In May 2014, the petition was amended adding one felony count of committing a lewd and lascivious act upon child under 14 years of age. (Pen. Code, § 288, subd. (a).) In the amended petition, the district attorney alleged that between December 3, 2010 and April 12, 2013, T.F, then 12 to 15 years old,[3] committed a lewd and lascivious act on E.C.

The contested jurisdictional hearing commenced in September 2014. Evidence was presented that from 2008 and 2012, T.F. lived with his mother, Veronica, and his two older siblings in a house in Antioch. Beginning in October 2008, Veronica babysat her friend Heather's daughter, E.C. Occasionally, Veronica also watched E.C.'s older sister, C.C., along with E.C.'s older brothers, J.R. and Z.C. All four children were at Veronica's house together six or seven times between 2010 and 2012. In April 2012, E.C. was four years old, C.C. was ten years old, J.R. was eight years old, and Z.C. was six years old. T.F. was 14 years old.

A number of witnesses testified, including E.C., who was six years old at the time of the hearing. E.C. testified that she remembered Veronica and that T.F. was her son,

---

[1]    In light of this holding, we need not address appellant's claims of ineffective assistance of counsel raised in his petition for habeas corpus. By separate order, we dismiss the petition as moot.

[2]    The court dismissed the weapon possession allegation on the prosecutor's motion.

[3]    According to the petition, T.F. was born in December 1998.

2

but she could not identify T.F. at the hearing. E.C. remembered a boy at Veronica's house doing something to her that she did not like, but she forgot what it was. She did not recall playing with Veronica's kids or the last time she was at Veronica's house.

Z.C., E.C.'s eight-year-old brother, recalled an incident when he and his brother, J.R., were playing video games in T.F.'s room, when he saw T.F. chasing E.C. around the room. When T.F. caught E.C. he pulled her pants down. Z.C. saw E.C. trying to cover herself and pull up her pants. From where he was in T.F.'s room, Z.C. could not see E.C.'s private parts and he did not see T.F. touch E.C.'s vagina. Z.C. felt "not okay" about what had happened and he went downstairs. Z.C. was "100 percent" sure that J.R. and C.C. were both in the room when this incident occurred.

J.R. recalled being in T.F.'s room with Z.C. playing video games, when he saw T.F. pull down E.C.'s pants and touch her bare vagina with his hand for about five seconds. J.R. saw E.C. crying. Seeing this incident made J.R. mad, and he left the room. J.R. did not tell anyone about the incident because it was "none of [his] business." J.R. did not recall C.C. being present during the incident.

C.C. testified that when she was at Veronica's house, T.F. made her feel "weird" when he asked her to be his girlfriend even though he was "way older" than she was. C.C. saw T.F. and E.C. playing together sometimes, but she never saw them alone in a room and never witnessed T.F. doing anything inappropriate to E.C. Occasionally, C.C. saw T.F. lift up E.C.'s shirt and blow on her stomach to make "raspberry" sounds. C.C. thought this was just "playing around," and she did not recall her sister crying or telling T.F. to stop. At some point, E.C. told her that T.F. had touched her vagina.

Heather testified that one day in April or May 2012, E.C. screamed and cried and told her that she did not want to go to Veronica's house anymore. After E.C. complained about pain in her vagina and started to act abnormally,[4] Heather took E.C. to the doctor. Although the doctor found no evidence of improper touching, he told Heather she should

---

[4] Heather testified that E.C. was wetting her pants, refusing to go the restroom by herself, and avoiding male family members, including her father.

not continue to take her children to Veronica's house if she had any concerns for the children's safety. Heather immediately stopped taking her children to Veronica's house, but still occasionally socialized with her.

Heather testified that, on April 12, 2013, when E.C. was four and half years old, she told her that she did not want to go to Veronica's house because T.F. was "nasty" to her. When Heather asked E.C. to explain what she meant, E.C. got upset and began crying because she was worried that Heather would get mad. After Heather reassured E.C. that she would not be in trouble, E.C. said that T.F. had touched her "coo-coo and her butt" with his finger, and he had pulled down his pants. E.C. used the term "coo-coo" for her vagina. E.C. told Heather that she did not like going into T.F.'s bedroom. E.C. also said that she liked it better when her brother was with her at Veronica's house, because T.F. would not do "the nasty things to her" when her brother was there. Later that evening, Heather went to Veronica's house to talk to her about what E.C. said about T.F. A short while later, a pastor from Veronica's church arrived and spoke privately with T.F. After her conversation with T.F., the pastor told Heather and Veronica what T.F. had told her.[5]

A 2014 recording of then five-year-old E.C. was admitted into evidence, in which she told a Children's Interview Center interviewer that she did not want to be around T.F. because he was mean to her.[6] When asked if anyone had touched her private area, she equivocated and did not want to talk about it. E.C. refused to say why she did not want to be around T.F., until the interviewer asked if it had anything to do with the private parts of the body. E.C. pointed to the vaginal area on a picture and circled it.

On May 20, 2014, Antioch Police Detectives Hewitt and McManus met with then 15-year-old T.F. at his high school A school security officer brought T.F. from class to a

---

[5] The pastor testified that T.F. told her that he had touched E.C.'s "private parts, between her legs," with his hand. The court later excluded the pastor's testimony under the clergy-penitent privilege.

[6] We have reviewed the video recording and the accompanying transcript.

conference room next to the principal's office. The detectives were not in uniform, but Hewitt's badge and firearm were visible. The officers' questions quickly evolved from basic information gathering into an interrogation. The interrogation, which was recorded, consumed nearly 60 minutes.[7] At no time did the officers give T.F. a *Miranda* warning. Throughout the interrogation, Hewitt stated as a fact that T.F. had touched E.C. in a sexual manner. T.F. adamantly denied Hewitt's repeated assertions that he had touched E.C. improperly.[8] Hewitt persisted, telling T.F., "I know some time has passed since this happened. But . . . this incident did occur." At another point, Hewitt tells T.F., "I know this was some time ago and you were a lot younger and things have changed now . . . but it's . . . time to . . . tell the truth . . . ." When Hewitt asked T.F. whether it was "a one-time, isolated incident," T.F. said it was "one time," but quickly denied touching E.C. T.F. was very emotional, sobbing at numerous points during the interrogation. He repeatedly said he wanted to go back to class or to go home. Instead of being allowed to leave, the officers handcuffed T.F., placed him under arrest and transported him to the police station.

Following the 15 to 20 minute ride to the station and a brief detention in a holding cell, Hewitt resumed his questioning of T.F.; McManus was not present. The subsequent interrogation, which we later relate in greater detail, consumed about 45 minutes.[9] At the start of the interrogation, Hewitt told T.F., "I'm gonna read these to you before we talk, okay?" Immediately after delivering a rapid recitation of the *Miranda* warning, Detective Hewitt asked T.F. about an outstanding warrant before he returned to the pre-*Miranda*

---

[7]     The interview was recorded and transferred to a compact disc (CD). The interview was also transcribed. Both the CD and transcript were admitted into evidence. We have reviewed the CD and its accompanying transcript on appeal.

[8]     By our count, T.F. denied touching E.C. inappropriately at least 23 times, in the course of the nearly hour-long interrogation.

[9]     The interview was recorded and transferred to a CD. The interview was also transcribed. Both the CD and transcript were admitted into evidence. We have reviewed the CD and its accompanying transcript on appeal.

5

interrogation: "[G]oing back to what we were talking about up at the school . . . [N]ow that you've had a little bit of time to think about what's going . . . I just wanted to give you the opportunity to talk to me again." Throughout the session, Hewitt stated as a fact that T.F. touched E.C.'s vagina. T.F. adamantly denied touching E.C.'s vagina.[10] Finally, when Hewitt suggested T.F. might have touched "her vagina over her pants a little bit," he said "Yeah." When Hewitt pressed for further details, T.F. replied: "I said it. I said it . . . I said it, I did it." When Hewitt asked T.F. why he stopped touching E.C., he said: "I was thinking to myself that it was wrong to do this. I was, it was like, while I was doing it I was like, it's wrong, it's wrong. And then I stopped myself."

Before and again at the jurisdiction hearing, defense counsel moved to exclude the statements on the grounds that T. F. did not voluntarily waive his *Miranda* rights. The court granted the motion as to the statements made at the school, but denied it as to the statements T.F. made at the police station. In finding T.F.'s statements at the station voluntary, the court observed that T.F. was advised of his rights and not tricked or cajoled. Although neither the transcript nor the audio recording of the second interrogation showed what happened at the interview, the court found Hewitt's testimony—that he understood T.F.'s "uh-huh, with nodding of the head," to be an affirmation—to be credible. Citing *Oregon v. Elstad* (1985) 470 U.S. 298, the court found the second statements were not tainted by the improper interrogation at the school. Even though T.F. was still upset and crying, the court found that his implied waiver was knowing and voluntary.

At the close of the jurisdiction hearing, the court found "beyond a reasonable doubt" that T.F. committed a violation of Penal Code section 288, subdivision (a) and that he knew it was wrong at the time he did it.

At the January 2015 disposition hearing, evidence was introduced that T.F. had been diagnosed with an "intellectual disability" in elementary school. T.F. remained a

---

[10]     Before admitting that he touched E.C. "a little bit" over her pants, he had denied any inappropriate touching over 50 times.

6

"special-ed" student from that time on.  T.F.'s special education teacher reported that he reads and writes at a fourth grade level.  At the close of the hearing the court declared T.F. a ward of the court and placed him on probation at his mother's home, subject to numerous conditions.

## DISCUSSION

### A.     *T.F. Did Not Knowingly, Intelligently and Voluntarily Waive His Miranda Rights.*

T.F. contends the juvenile court erred in denying his motion to suppress his statements because he did not voluntarily, knowingly, and intelligently waive his *Miranda* rights.  We agree.

To protect a suspect's privilege against self-incrimination, a suspect who is taken into custody "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." (*Miranda, supra,* 384 U.S. at p. 479.)  Once properly advised of *Miranda* rights, a suspect may waive them provided the waiver is voluntarily, knowingly and intelligently made.  (*Ibid.*)

The prosecution has the burden of establishing, by a preponderance of the evidence, the voluntariness of an accused person's waiver of his *Miranda* rights.  (*People v. Whitson* (1998) 17 Cal.4th 229, 248.)  The waiver of *Miranda* rights must be voluntary in the sense that it was the product of a free and deliberate choice, and was made with a full awareness of the nature of the right being abandoned and the consequences of the decision to abandon it.  (*People v. Smith* (2007) 40 Cal.4th 483, 501-502.)  "[A] valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained." (*Miranda, supra,* 384 U.S. at p. 475.)

To determine whether a juvenile's waiver of his *Miranda* rights is voluntary, a court should consider the totality of the circumstances, including the minor's "age, experience, education, background, and intelligence, and . . . whether he has the capacity

7

to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." (*Fare v. Michael C.* (1979) 442 U.S. 707, 725.) When a confession by a minor is involved and "counsel was not present for some permissible reason when an admission was obtained, the greatest care must be taken to assure that the admission was voluntary . . . ." (*In re Gault* (1967) 387 U.S. 1, 55.) On review, the appellate court defers to the trial court's factual findings if they are supported by substantial evidence but reviews de novo the ultimate question of whether a waiver was voluntary. (*People v. Holloway* (2004) 33 Cal.4th 96, 114; *People v. Lewis* (2001) 26 Cal.4th 334, 383.)

Here, the record does not show that appellant understood all of his *Miranda* rights and voluntarily, knowingly and intelligently waived them. First, Hewitt rapidly rattled off the *Miranda* admonition without taking time to determine whether T.F. understood all of his rights. Hewitt gave T.F. the following warning:

"Q: I'm gonna read these to you before we talk, okay? You have the right to remain silent. Do you understand that right? Anything you say may be used against you in court. Do you understand this right? You have the right to talk to an attorney before you answer any questions and the right to have that attorney present with you during questioning. Do you understand this right?

"A: Mm hmm.

"Q: Okay. If you cannot afford an attorney and want an attorney to represent you, an attorney will be appointed before any questioning to represent you free of charge. Do you understand this right?

"A: Yes sir."

As noted, neither the transcript nor the audio recording of the second interrogation was video taped so there was no visual record to show what happened at the interview. Nevertheless, the court found Hewitt's testimony—that he understood T.F.'s "uh-huh, with nodding of the head," to be an affirmation—to be credible. We may not second-guess that determination. (See *In re Maya L.* (2014) 232 Cal.App.4th 81, 104, fn. 6 ["[a]s

8

a reviewing court, we have no power to revisit the credibility of witness[es] or reweigh the evidence"].)

Nevertheless, we do not find substantial evidence supporting the juvenile court's finding that T.F. was not cajoled or tricked. Hewitt informed T.F. of his *Miranda* rights after the youth had already undergone a nearly hour-long interrogation by two police detectives while confined in a school conference room, which culminated in his arrest. T.F. was sobbing and clearly distraught at school and remained so during the subsequent interrogation. Then, once at the station, before giving the *Miranda* warning, Hewitt told T.F., "I'm gonna read these to you *before we talk*, *okay*?" (Italics added.) By this statement, Hewitt stated as a fact that T.F. would talk to him. This statement followed by the immediate recitation of rights, which included the right to remain silent, was contradictory and confusing.

Then, after telling T.F. they were going to "talk" and quickly dispensing the *Miranda* warning, Hewitt immediately launched into questioning T.F. about an unrelated outstanding warrant. From listening to the recorded interview, it is clear that T.F. was confused about the warrant. Hewitt asked T.F. several questions about the warrant before telling T.F., "let's forget about the warrant for right now . . . That doesn't really have anything to do with this case. I was just curious if you remembered." After befuddling T.F. by mixing up the *Miranda* rights with the warrant, Hewitt smoothly transitioned to questioning T.F., referring him "back to what we were talking about up at the school."

The Attorney General asserts that T.F.'s responses to Hewitt's questions were rational, appropriate, and understandable. Although an express waiver is not required where a suspect's actions make clear that a waiver is intended (*People v. Whitson, supra,* 17 Cal.4th at p. 250), here, T.F.'s actions did not clearly show that he was fully aware of "the nature of the right being abandoned and the consequences of the decision to abandon it" (see *People v. Smith, supra,* 40 Cal.4th at pp. 501-502).

T.F.'s age and his lack of experience with the criminal justice system further support our conclusion that appellant did not voluntarily, intelligently, and knowingly waive his rights. At the time of his interview, T.F. was a 15 years-old high school

9

freshman. (See *In re Anthony J.* (1980) 107 Cal.App.3d 962, 971 [prosecutor's burden to establish voluntariness is greater if the accused is a minor rather than an adult].) Although he had been contacted by police in 2013 about possessing a knife at school, there is no evidence that T.F. had ever been in custody or interrogated by police. He cried when he was arrested and begged the officers not to "send" him "to jail." During the second interrogation, T.F. told Hewitt that he was "scared" that he would "be locked up forever." When Hewitt asked T.F. if it helped "to talk about it," T.F. replied: "Yeah, but if I do I'm gonna just go to jail. But at the same time, what is the point in lying? Because I'm already going there either way." According to the probation report, T.F. had no behavioral problems while in juvenile hall, but did complain about being bullied by other kids there. His mother reported that he was a good kid, who helped around the house, went to church, and did not use alcohol or drugs. Also, since elementary school, T.F. has been in a special education program due to a diagnosed "intellectual disability."

This case is distinguishable from others in which no *Miranda* violation was found. For example, *In re Charles P.* (1982) 134 Cal.App.3d 768, 772, emphasized that the minor was "worldly," was on probation and had previously been advised of his *Miranda* rights. In addition, there was nothing in the minor's actions or words to suggest a lack of understanding of his rights. (*Ibid.*) In *In re Frank C.* (1982) 138 Cal.App.3d 708, 712, the minor " 'ha[d] been arrested innumerable times in the last couple of years," was on probation at the time of questioning, and clearly indicated that he understood each of his *Miranda* rights. In *In re Steven C.* (1970) 9 Cal.App.3d 255, 268, the 16-year old minor was found to have waived his *Miranda* rights where the rights were clearly and concisely and in plain language explained to him, he had "a good deal of prior police contact," and he had been given the *Miranda* warning on five prior occasions.

The record supports the conclusion that T.F. did not voluntarily, knowingly, and intelligently waive his right to counsel.[11]

---

[11] T.F. additionally challenges the adequacy of the *Miranda* warning given; he also contends Hewitt gave an improper midstream *Miranda* warning, such that his statements

10

***B.***     ***T.F.'s confession was not voluntary.***

T.F. claims his confession was involuntary under the due process clause of the Fourteenth Amendment, as it was the product of the type of coercive techniques condemned in *Miranda*, which had "overborne his will."

Preliminarily, the Attorney General contends that T.F. did not argue below that his confession was the product of coercive police tactics and therefore this claim is not preserved for review. However, it is well established that even when a party has forfeited a right to appellate review by failing to preserve a claim in the trial court, an appellate court may still review the claim as an exercise of its discretion. (*People v. Williams* (1998) 17 Cal.4th 148, 161-162, fn. 6; *People v. Johnson* (2004) 119 Cal.App.4th 976, 984 [" '[T]he fact that a party, by failing to raise an issue below, may forfeit the right to raise the issue on appeal does not mean that an appellate court is precluded from considering the issue.' " (Italics omitted)].) Exercising this discretion, we agree that T.F.'s confession was not voluntary.

"The use of an involuntary confession for any purpose in a criminal or delinquency proceeding violates a defendant's or minor's rights under the Fourteenth Amendment. [Citation.] [¶] '. . . A minor can effectively waive his constitutional rights [citation] but age, intelligence, education and ability to comprehend the meaning and effect of his confession are factors in that totality of circumstances to be weighed along with other circumstances in determining whether the confession was a product of free will and an intelligent waiver of the minor's Fifth Amendment rights [citation].' [Citation.] [¶] The federal and state Constitutions both require the prosecution to show the voluntariness of a confession by a preponderance of the evidence. [Citations.] Voluntariness turns on *all* the surrounding circumstances, 'both the characteristics of the accused and the details of the interrogation' [citation]; it does not depend on whether the

---

at the station were tainted by his earlier custodial interrogation at school. In light of our conclusion that T.F.'s *Miranda* rights were otherwise violated, we will not address these contentions. Similarly, we do not reach T.F.'s claim that there was insufficient evidence that he harbored the requisite intent to violate Penal Code, section 288, subdivision (a).

confession is trustworthy. [Citation.] While a determination that a confession was involuntary requires a finding of coercive police conduct [citations], ' " 'the exertion of any improper influence' " ' by the police suffices." (*In re Elias V.* (2015) 237 Cal.App.4th 568, 576-577 (*Elias V.*).) However, " ' " mere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary." ' " (*In re Shawn D.* (1993) 20 Cal.App.4th 200, 210.)

Where the voluntariness of a confession is raised on appeal, the reviewing court examines the undisputed facts to determine independently whether the juvenile court's conclusion of voluntariness was proper. (*In re Shawn D., supra,* 20 Cal.App.4th at p. 207.) We accept the juvenile court's resolution of disputed or conflicting facts and related inferences, as well as its determinations of credibility, so long as they are based on substantial evidence. (*People v. Sapp* (2003) 31 Cal.4th 240, 267.) However, where, as here, there is a recorded interview and "the facts surrounding the giving of the statement are undisputed, . . . the appellate court may independently review the trial court's determination of voluntariness." (*People v. Vasila* (1995) 38 Cal.App.4th 865, 873.)

T.F. argues that his confession was involuntary under the totality of the circumstances, which include not only his age, documented learning disability, lack of sophistication, minimal experience with law enforcement, his emotional state, but also coercive police interrogation tactics that overbore his will. In particular, he contends the police relentlessly interrogated him for nearly one hour and a half (approximately 60 minutes at school and 30 minutes at the station). In addition to the lengthy interrogation, T.F. was isolated in two small rooms, first at his school and then at the station. T.F. further complains that Hewitt "buffeted" him "with accusations of guilt, assertions bolstered by evidence, and refused to accept his denials." According to T.F., Hewitt utilized the tactic of maximization to convey his "rock-solid belief that T.F. was guilty and that all of his denials would fail."

T.F. relies on *Elias V.*, in which our colleagues in Division Two of this judicial district detailed the very real dangers of false confessions in cases involving police interrogation of juveniles, particularly adolescents. (*Elias V.*, *supra*, 237 Cal.App.4th at pp. 577-579, citing *J.D.B. v. North Carolina* (2011) 564 U.S. 261.) In *Elias V.,* the court focused on the use of an interrogation approach referred to as " 'maximization/minimization' " that involves a " 'cluster of tactics' designed to convey two things. The first is 'the interrogator's rock-solid belief that the suspect is guilty and that all denials will fail. Such tactics include making an accusation, overriding objections, and citing evidence, real or manufactured, to shift the suspects mental state from confident to hopeless . . . . [¶] In contrast, minimization tactics are designed to provide the suspect with moral justification and face-saving excuses for having committed the crime in question,' a tactic that 'communicates by implication that leniency in punishment is forthcoming upon confession.' " (*Elias V., supra,* 237 Cal.App.4th at p. 583.) The court warned of the dangers posed by the use of these maximization and minimization tactics with juveniles. The court observed that even the police interrogation manual "notes that although the use of deception, including the use of 'fictitious evidence which implicates the subject,' [citation], has been upheld by the courts [citations], 'this technique should be avoided when interrogating a youthful suspect with low social maturity . . .' because such suspects 'may not have the fortitude or confidence to challenge such evidence and depending on the nature of the crime, may become confused as to their own possible involvement if the police tell them evidence clearly indicates they committed the crime. Factors such as the adolescent's level of social responsibility and general maturity should be considered before fictitious evidence is introduced.' " (*Id*. at p. 588.) Similarly, "A convincing body of evidence demonstrates that implicit promises can put vulnerable innocents at risk to confess by encouraging them to think that the only way to lessen or escape punishment is compliance with the interrogator's demand for confession, especially when minimization is used on suspects who are also led to believe that their continued denial is futile and prosecution inevitable." (*Id*. at p. 583.)

13

T.F. contends Hewitt's use of these tactics resulted in a confession that was involuntary. Early in the interrogation, Hewitt confidently declared that T.F.'s improper touching of E.C. "did occur" because he "interviewed everyone in that family . . . And their stories are all pretty consistent about what they saw." Ignoring T.F.'s repeated denials, Hewitt referred to T.F.'s guilt as an established fact and displayed interest only in confirming details, such as why and how T.F. committed the act, and never allowing the possibility he may not have committed any unlawful act. Hewitt's questions, all insinuating T.F. had improperly touched E.C.'s genitals, were relentless: "Did you take off her pants? Did she take off her pants?"; "Did you put your hand in her pants?"; "Did you touch her vagina?"; "Not even outside of the pants?"; "How did she get her pants down? How does that happen? There's only two ways. Either she pulled them down or you pulled them down"; "So you pulled her pants down. Right?"; "Did you pull her underwear off?"; "And when you touched her, where did you touch her T[.]?"; "Did you touch her legs?"; "Did you take her underwear off?"; "Did you take her underwear off?"; "Did you touch her vagina?"; "Not outside the pants? Not inside the underwear? Not outside the underwear?"; "But some other kids said they saw . . . [E.C.] with her pants down"; "Are you scared to tell me that you did?"; "Did you think about touching her vagina?"; "And you weren't curious about maybe touching her vagina?"; "All I asked you is if you touched her vagina with your hand"; "Did you touch her vagina over her pants a little bit?"; "I'm asking you pretty direct, is if you touched her vagina, you know, clothes or no clothes over the pants. Or over the underwear, under the underwear. And you're saying no"; "Is this before you took her pants off?"

As described by the court in *Elias V.*, the aggressive nature and persistence of Hewitt's questioning was designed to create a sense of hopelessness. (*Elias V., supra,* 237 Cal.App.4th at p. 584.) The maximization tactics Hewitt employed during his accusative questioning were deceptive in a variety of ways, including the threat to subject T.F. to a lie detector test that would definitively reveal the falsity of his denials— "referred to in the literature as 'the lie detector ploy'—is among the most common interrogation techniques that result in false confessions. [Citations.]" (*Elias V., supra,*

14

237 Cal.App.4th at p. 584.) Hewitt also shifted his tactics from maximization to minimization, which ultimately induced T.F. to make his inculpatory statements. After telling T.F. that he "just wanted to give" him another "opportunity to talk" about what happened, T.F. said "I didn't exactly touch her" and that he did not put his "hand in her vagina or anything like that." T.F. said he touched E.C.'s face and her stomach, "[a]nd that was it." Hewitt suggested that T.C. "never touched her vagina? Not even for a second?" T.F. adamantly denied touching E.C.'s vagina, swearing on "everything [he] love[d]." The interrogation proceeded this way:

"Q. Okay. Why would [you] touch her stomach?

"A.: I don't know.

"Q: Were you, you know, were you curious?

"A: I was twelve at the time.

"Q.: I know. I know it was a while back. I mean–you were a little younger. You know?

"A: I was twelve at the time man. I didn't know. I didn't know. I swear I didn't know. I'm not a bad kid. I'm not. I'm well behaved. But I was twelve at the end and I didn't know. I swear I didn't know.

"[¶] . . .[¶]

"Q: What else happened?

"A: And um-

"Q: You might as well, you know, you might as well tell me everything. Just tell me the truth. Get it off your chest.

"A: I'm gonna go to jail if I do.

"Q: Let's not worry about that right now. Let's just worry about getting the truth out and know, let's worry about you know, being honest and going from there. Okay? Because honesty is always the best bet in these kinds of situations. You know? Just tell me what happened.

"A. I'm scared.

"Q: I know.

15

"A:    I'm scared.  I'm so scared.

"Q:    Being scared it totally understandable considering, you know, everything that is going on today.  You know, but this is your opportunity to be honest with me.  We sat there and talked for almost an hour at the high school.  Okay?  I explained to you this kind of stuff doesn't just go away, you know.

"A:    Yeah.

"Q:    I mean, I know you weren't completely honest with me up there.  Just be honest with me now.  Tell me the truth.  You know, let everything just kind of happen the way it needs to happen and be honest with me and you know, and be responsible for what happened and you know . . . ."

At this point, T.F. begins to cry, telling Hewitt that was "scared" he would be "locked up forever," and that he didn't "want to go to jail."  While T.F. is crying, Hewitt tells T.F. that he knows he is sorry and asks T.F. if this was "a one-time thing?"  T.F. confirmed that it happened only once and that he "never did that again."  When T.F. said that he "felt very bad," the interrogation continued this way:

"Q:    Doesn't it help to talk about it though?  To get it out . . .?

"A:    Yeah, but if I do I'm gonna just go to jail.  But at the same time, what is the point in lying?  Because I'm already going there either way.

"Q:    Yeah, I mean, you want to be an honest person don't you?

"A:    Yes.

"[¶] . . . [¶]

"Q:    Then you're right.  What's the point in lying?  You know, at this juncture.  You know, honesty is, in my opinion, is always the best way to deal with the problem . . . ."

Eventually, after Hewitt proposed a variety of scenarios on how the touching happened, he induced T.F. to confess by minimizing the incident:

"Q:    Did you touch [E.C.'s] vagina over her pants a little bit?

"A:    Mm hmm.

"Q:    You did?

"A:    Yeah.

16

"[¶] . . .[¶]

"Q:    So you did touch her, [E.C.]'s vagina over her pants.

"A:    A little bit."

Hewitt's accusatory interrogation was dominating, unyielding, and intimidating. These overbearing tactics, combined with T.F.'s youth, which rendered him " 'most susceptible to influence' [citation], and 'outside' pressures,' [citation]" (*J.D.B., supra,* 564 U.S. at p. 275), support the conclusion that T.F.'s statements were involuntary.  As noted by the court in *Elias V., supra,* 237 Cal.App.4th at page 587, "since *Miranda* courts have expressed growing concern that the pressures of custodial interrogation ' "can induce a frighteningly high percentage of people to confess to crimes they never committed" ' (*Corley v. United States* [2009] 556 U.S. [303] at pp. 320-321), and this concern is deepest in cases involving the custodial interrogation of juveniles.  As recently stated in *J.D.B., supra,* 564 U.S. 261, 131 S.Ct. at p. 2403 "[a] child's age is far 'more than a chronological fact.' " [Citations.]  It is a fact that "generates commonsense conclusions about behavior and perception." [Citation.]  Such conclusions apply broadly to children as a class.  And, they are self-evident to anyone who was a child once himself, including any police officer or judge.  [¶]  Time and again, this Court has drawn these commonsense conclusions for itself.  We have observed that children "generally are less mature and responsible than adults," [citations]; that they "often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them," [citation]; that they "are more vulnerable or susceptible to . . . outside pressures" than adults, [citation]; and so on.  [Citation.]  Addressing the specific context of police interrogation, we have observed that events that "would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens."  [Citations.]  Describing no one child in particular, these observations restate what "any parent knows"–indeed, what any person knows–about children generally.  [Citation.]' (See *Gallegos v. Colorado* (1962) 370 U.S. 49, 53 [' "Age 15 is a tender and difficult age for a boy. . . . He cannot be judged by the more exacting standards of maturity.  That which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early

17

teens. This is the period of great instability which the crisis of adolescence produces" '].)"

Contrary to the juvenile court's view that Hewitt did not "threaten[], trick[], or cajole[]" T.F. into giving a statement, his pervasive use of maximization and minimization techniques, combined with his unrelenting exhortations to be honest and tell him what happened are precisely the things that could overwhelm an adolescent such as T.F. and induce him to incriminate himself.

In *Elias V., supra,* the court discussed a Kentucky case "with some striking similarities" to the one before it. (237 Cal.App.4th at p. 589) *Commonwealth v. Bell* (2012) 365 S.W.3d 216 at pages 224-225, "emphasized the significance of the 13-year-old suspect's age in evaluating the effect on him of various aspects of the questioning." (*Elias V., supra,* 237 Cal.App.4th at p. 589.) "Like Elias, T.C. was questioned at his middle school by two police detectives who had school officials remove the boy from class and bring him to a separate room for questioning about allegations that he had anal intercourse with his six-year-old cousin in the shower. [Citation.] The detective told T.C. that " 'thirteen-year-old boys "have a lot of hormones," and sometimes get "horny" and "get a little bit curious," ' then asked what had happened in the shower. [Citation.] As T.C. denied improper conduct, the detective insisted he already knew what happened but wanted T.C. to be honest with him; said he had to find out whether it happened accidentally or intentionally; suggested T.C. might have been curious or might have been ' "messing around" '; insisted he needed to know why T.C. did it; and told T.C. he had to be honest and ' "[w]e can be done here." ' "
[Citation.] Finally, the detective said, ' "you did it because you were horny, had a hard on, and you were curious . . . . Am I right?" ' [Citation.] T.C. replied, ' "yes, sir." '
[Citation.]" (*Elias V., supra,* 237 Cal.App.4th at pp. 589-590.)

"Upholding the lower court's finding that the confession was involuntary, the *Bell* court noted the prosecution's argument that the detectives did not deprive T.C. of food or sleep and used a calm, conversational tone. But, the court explained: 'These latter statements may serve to assure an adult, or even a mature minor, that he should feel

18

free of coercion, that he is free to say nothing and even to leave the officers' presence any time he desires. However, we do not believe they provided that same assurance, under these circumstances, to this thirteen-year-old boy.' (*Commonwealth v. Bell, supra,* 365 S.W.3d at p. 224.) '[A] school is where compliance with adult authority is required and where such compliance is compelled almost exclusively by the force of authority. Like it or not, that is the definition of coercion. . . . If he is sent to the principal's office, he is not allowed to leave until the principal says so. And if he is instructed to be alone in a room with police detectives, as T.C. was, how can we expect him to believe some other set of rules applies? Can we reasonably expect a thirteen-year-old child to perceive he has *greater* freedom while in school simply because he was read his *Miranda* rights? When the detective said, "I really can't leave here until I find out" something, is it reasonable to believe T.C. did not feel coerced into saying *something,* whether true or not; is it reasonable that he believed *he* had the right to say nothing or to get up and leave the detective there alone? We believe not. [¶] Although the thirty-two minute interrogation may not seem excessive, the repetitive questioning amounted to coercion by importunity. T.C., alone, was ordered by school officials into a room, facing adult authority figures with considerable power, who also feigned superior knowledge ('I know what happened [and your cousin] has not lied to me about anything'), and who repeatedly demanded answers that he, if he was to be an obedient child, would have to provide. How could T.C. not perceive such a situation as subjectively coercive?' " (*Id.* at p. 225, fn. omitted.) 'T.C. was an impressionable youth inclined to acquiesce to coercive police tactics. . . . In sum, viewing the interrogation through the lens of this thirteen-year-old student, under these circumstances, we are persuaded the district court did not err in finding T.C.'s statements to Detective Johnson "were not the product of [his] free choice" when given.' (*Ibid.*)" (*Elias V., supra,* 237 Cal.App.4th at pp, 590-591.)

At 15 years of age, T.F. was a young adolescent, there is no indication in the record that he was particularly sophisticated. In fact, the record supports the conclusion that T.F. has lived a fairly sheltered life. He is described as a good kid, who helped his mother with chores and attended church activities. Additionally, T.F. "was found eligible

19

for special education services" on the basis of a documented intellectual disability. His prior police contact was minimal, stemming from a single incident where he brought a knife to school. There is no evidence that he was detained or interrogated in that case. Prior to his confession at the station, T.F., had been interrogated in a small room at his school by two armed officers. Throughout this nearly hour-long interrogation at school, T.F. sobbed uncontrollably. He begged the officers to let him return to class or to go home. Then, once at the station, he was subject to a nonstop barrage of questions, all insinuating that he had inappropriately touched E.C. and that he should come clean and tell the truth. After T.F. admitted that he had touched E.C.'s stomach and the sides of her waist, Hewitt was not satisfied with this response. Instead, he relentlessly pursued what he deemed to be the final "piece of this puzzle"—that T.F. touched E.C.'s vagina. As in *Elias*, there is every reason to believe the aggressive, deceptive, and unduly suggestive tactics Hewitt employed would have been particularly intimidating in these circumstances.

Admittedly here, unlike in *Elias V.*, T.F.'s confession was not the sole evidence of the manner in which T.F. allegedly touched E.C. (See, *Elias V., supra,* 237 Cal.App.4th at pp. 591-592.) However, considering the totality of the circumstances and the vulnerabilities of adolescents subjected to custodial interrogation that have been emphasized by the Supreme Court (*J.D.B., supra,* 564 U.S. 261 and cases there cited), we conclude that the inculpatory statements made by T.F. to Hewitt cannot be deemed a product of his free will.

## C.     *The Error Was Not Harmless*

T.F. contends the error in admitting the confession, which was obtained in violation of his *Miranda* rights and was not voluntarily made, was not harmless beyond a reasonable doubt.

Penal Code section 288, subdivision (a) states in relevant part: "[A]ny person who willfully and lewdly commits any lewd or lascivious act, . . . upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or

20

the child, is guilty of a felony . . . ." (§ 288, subd. (a).) Penal Code section 26 requires that there be "clear proof" that a child under the age of 14 knew the wrongfulness of a criminal act before he or she can be found to have committed it.

T.F. argues that without his incriminating statements there is insufficient evidence showing that he either acted with the requisite sexual intent or appreciated the wrongfulness of his acts. We agree.

Courts "have long indicated that section 288 prohibits *all* forms of sexually motivated contact with an underage child. Indeed, the 'gist' of the offense has always been the defendant's intent to sexually exploit a child, not the nature of the offending act. [Citation.] '[T]he purpose of the perpetrator in touching the child is the controlling factor and each case is to be examined in the light of the intent with which the act was done . . . If [the] intent of the act, *although it may have the outward appearance of innocence*, is to arouse . . . the lust, the passion or the sexual desire of the perpetrator [or the child,] it stands condemned by the statute . . . .' [Citation.] [¶] Thus, . . . cases have made clear . . . that sexual gratification must be presently intended at the time such 'touching' occurs." (*People v. Martinez* (1995) 11 Cal.4th 434, 444.) Minors, as well as adults, may be found to have acted with this sexual intent so as to violate Penal Code section 288, subdivision (a). (See *In re Randy S.* (1999) 76 Cal.App.4th 400, 403-404 (*Randy S.*) [11–year-old boy found to have violated Penal Code section 288, subdivision (a) because of extrajudicial statements and conduct indicating he acted with the specific intent to arouse his sexual desires].)

Intent is seldom proven by direct evidence, but may be inferred from the circumstances. "Circumstances which have been considered relevant to proving intent to satisfy sexual desires include: the charged act, extrajudicial statements, the relationship of the parties, other acts of lewd conduct, coercion or deceit used to obtain the victim's cooperation, attempts to avoid detection, offering of a reward for cooperation, a stealthy approach to the victim, admonishment of the victim not to disclose the occurrence, physical evidence of sexual arousal and clandestine meetings." (*In re Jerry M.* (1997) 59 Cal.App.4th 289, 299.) Further, "the younger the minor the less likely his acts are with

21

the specific intent of sexual arousal. At some age younger than 14 years, . . . the minor cannot as a matter of law have the specific intent of sexual arousal." (*Id.* at p. 300.)

The juvenile court found there was substantial evidence that T.F. violated Penal Code section 228, subdivision (a) based on T.F.'s admission that he touched E.C.'s vagina outside of her clothing, as well as other parts of her body. The court also relied on T.F.'s statement that he knew what he was doing was wrong to overcome the Penal Code section 26 presumption that T.F. did not understand the wrongfulness of his conduct.

As part of his admission, T.F. said he was alone with E.C., in his room, when he touched her. Without this admission, the remaining evidence comes from E.C.'s brothers, who testified that they witnessed T.F. act inappropriately towards E.C. while they were in T.F.'s room playing video games. That the brothers were in the room when the touching occurred indicates that T.F. did not act clandestinely and was not trying to avoid detection. There was also no evidence indicating T.F. had gone through puberty, had used coercion or deceit to get E.C.'s cooperation, or acted in any other manner suggesting that he touched E.C. with the requisite intent. (See (*Jerry M.*, *supra*, 59 Cal.App.4th at p. 299.) Similarly, without T.F.'s statement that he knew touching E.C. was wrong, we cannot say with certainty that there is sufficient evidence in the record to rebut the Penal Code section 26 presumption that he did not understand the wrongfulness of his conduct.

Without T.F.'s admissions there would have been insufficient evidence to establish the requite intent and to overcome the section 26 presumption. Thus, without these admissions there would have been insufficient evidence to sustain the petition.[12] In the absence of the confession, we cannot say, beyond a reasonable doubt, that the petition would have been sustained.

### DISPOSITION

The judgment is reversed.

---

[12] By reason of this holding, we need not address T.F.'s challenges to the conditions of his probation. Similarly, we do not consider T.F.'s claim that the juvenile court erred in failing to hold a deferred entry of judgment suitability hearing.

_____

REARDON, ACTING P. J.

We concur:


_____

RIVERA, J.


_____

STREETER, J.

*In re T.F.* A144085

Trial Court:                    Contra Costa County Superior Court


Trial Judge:                    Hon. John Thomas Laettner


Counsel for Appellant and       Eileen A. Manning-Villar
Defendant:                      Megan Glynn Crane
                                First District Appellate Project


Counsel for Respondents:        Bridget Billeter
                                Office of the Attorney General

A144085  *In re T. F.*