Filed 12/16/2019

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re Anthony L., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, <br><br>     Plaintiff and Respondent, <br><br> v. <br><br> ANTHONY L., <br><br>     Defendant and Appellant. | A154220 <br><br> (San Francisco City & County Super. Ct. No. JW186044) |

Before interrogating a 15-year-old in custody, police must arrange for the youth to consult with counsel.  (Welf. & Inst. Code, § 625.6, subd. (a).)[1]  Here we address the admissibility of a statement taken in violation of this statutory command.  Anthony L. (Minor) appeals a dispositional order of the juvenile court placing him on probation for committing assault with force likely to cause great bodily injury.  (Pen. Code, § 245, subd. (a)(4).)  He contends that the juvenile court should have excluded his statement to police officers, but because his rights under the United States Constitution were not violated, we disagree.  We will strike an impermissibly vague probation condition and otherwise affirm the order.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Assault

The victim of the crime, a 61-year-old man, pulled his car into the driveway of his home and waited for the garage gate to open.  He saw a group of five teenagers nearby.

---

[1] All undesignated statutory references are to the Welfare and Institutions Code.

They walked behind the victim's car, and he heard a loud bang, as if someone had hit or kicked his car. The victim got out of car and yelled at the teenagers, " 'Why did you do that? Why did you hit my car?' " One of them responded, " 'How do you know we did it?' " The victim said, " 'Well, did you do it?' " The teenagers "came at" the victim, surrounded him, and hit and kicked him repeatedly on his head and face. They ran away when someone who worked nearby approached and yelled that he was calling the police.

The incident was captured on nearby security cameras. One of Minor's teachers was shown a video and still photographs from the videos, and identified Minor as one of the assailants. She recognized him by the gray hooded sweatshirt he was wearing and the shape of his face. She checked a school photograph to "double check," but she was confident of her identification because she had been spending a lot of time with Minor since he had begun her class a couple of weeks previously.

### B. Minor's Statement to Police

After the teacher identified Minor, Sergeant Christopher Smith of the San Francisco Police Department contacted Minor's mother (Mother). Smith told her he was investigating a crime and needed to set up a meeting with Minor and Mother. They arranged for Smith to come to the family's home at 11:30 on the morning of February 21, 2018, a school day. Mother had told Smith she would like a Spanish speaker present, and Officer Martinez, who spoke Spanish, accompanied Smith. Smith wore plain clothes with a police badge and firearm, and Martinez was in a police uniform. Martinez's body camera recorded the events, and there was a second audio recording.

When the officers arrived, Mother led them to Minor's bedroom, where he was sleeping. Mother stayed in the room. Minor, who appeared to be wearing shorts, put pants on. He sat on his bed, and the officers remained standing.

Smith began the interview by asking Minor his name and date of birth. Minor had recently turned 15. Smith handed Minor a "Juvenile Know Your Rights" form, and Minor looked down at it. Smith told Minor, "I'm going to read you your rights just because you're a juvenile. It's not—you're not under arrest right now, okay, just understand that. But because you're a juvenile we have to read you your rights, okay."

2

Minor nodded slightly.  Smith then said, "You have the right to remain silent, do you understand?"  Minor nodded, and Smith continued, "Anything you say may be used against you in court, do you understand?"  Minor appeared to nod slightly but did not say anything, and Smith told him, "[Y]ou've got to verbally say it for me," and repeated the admonitions that Minor had the right to remain silent and that anything he said could be used against him in court, then informed Minor he had the right to an attorney and an attorney would be appointed free of charge before any questioning if he could not afford one.  When asked if he understood each statement, Minor answered "Yes."  Smith did not ask Minor a common final question in a *Miranda* warning—"Having those rights in mind, do you now wish to speak with me?"—because he did not think Minor was in custody.

Smith first asked Minor general questions about his schooling, asked whether Minor knew why Smith was there, then asked Minor where he was the evening of the assault.  After asking Minor if he was currently under the influence of any substances and whether he had ever been arrested, Smith asked whether he remembered being by the Safeway store on Marina Boulevard.  Minor nodded, and Smith said, "Can you verbalize that for me?"  Minor said, "Yeah."  Smith said, "And what happened behind the Safeway on North Point Street?"  Minor shrugged.  Smith asked, "Did you do something you weren't supposed to do?"  Minor again nodded, and Smith said, "Can you verbalize that for me?"  Minor replied, "Yeah."

Smith asked Minor, "And what did you do?" and Minor was silent.  Smith continued, "I know it's hard to talk man, it's—I don't want you to feel down on yourself, I seriously don't, but you know you did something wrong, right?  So I don't want you to . . . feel like you're a bad person right now[,] but I want to hear it from you what you did wrong."  Minor was silent and shrugged.  Smith asked, "Do you remember an old guy in a car?"  Minor nodded, and Smith said, "Okay, can you verbalize that for me?"  Minor said, "Yeah."  Smith asked, "And what happened with the old white guy?" and Minor said, "He—he started," then said something unintelligible.  Smith said, "I mean, there's

video of it so I mean that's why I'm here. So I remember him yelling at you. Do you remember what he said to you?" Minor shook his head and said, "Huh-uh."

Smith asked Minor what caused the group to react as they did, and Minor said, "I forgot." Smith continued, "But you remember what you guys did, what you and your friends did to him?" Minor nodded, and Smith asked, "Is that a yes?" Minor said, "Yeah." Smith asked Minor to explain, and Minor said, "You all got the video you can see." Smith told Minor that young people make mistakes, that he wanted him to "own up to [his] mistake," and that Minor should "man-up and take responsibility for [his] mistakes." Smith asked Minor if he agreed, and Minor said, "Yes." Smith continued, "So you want to man-up right now and tell me what happened? [Minor], can you tell me what you did?" Minor was silent. Smith asked Minor why he was being "shy," and Minor said, "Because I don't feel like talking." Smith told Minor he had been speaking to Mother, who wanted Minor to do well, and that he should be in a program. Minor agreed he should not be "doing things like that day." After further discussion about Minor's need for guidance and discipline and the importance of making good decisions, Smith asked if Minor could talk about what happened. Minor shook his head, and when asked why, said, "You all got the video you all can see what happened." Smith reiterated that Minor should own up to what he did, and asked Minor how many times he punched the man. Minor said he did not know. Smith said, "Was it three or more?" and Minor again said he did not know. Smith said, "Was it one?" and Minor shook his head.

Smith asked Minor for the names of the other people who were involved, and Minor said he did not know their names, then that he did not want to tell Smith. Smith asked why Minor hit the victim, and Minor said it was because the victim "said stuff." In response to more questioning, he admitted that he kicked the car and that he hit the victim because the victim made him upset. Asked again for the names of the other people involved in the incident, Minor said again that he did not want to tell Smith. Smith then placed Minor under arrest.

## C. The Juvenile Court's Rulings

A juvenile wardship petition alleged Minor committed assault with force likely to cause great bodily injury. (Pen. Code, § 245, subd. (a)(4).) Minor moved to exclude his statements to the police on constitutional and statutory grounds. The juvenile court denied the motion, finding that the interrogation was custodial but rejecting Minor's claims that his statements were obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) and were involuntary. For reasons discussed below, it also found no violation of section 625.6. Finding the allegations of the petition true, the court then declared Minor a ward and placed him on probation in Mother's home.

## II. DISCUSSION

### A. Challenges to Admission of Minor's Statements

Minor renews before this court his challenge to the admission of his statement to the officers. He contends the officers improperly questioned him before he consulted with an attorney in violation of section 625.6 and that the juvenile court erred in failing to take that fact into account in admitting his statements. He argues the *Miranda* warnings were inadequate and he did not knowingly, voluntarily and intelligently waive his *Miranda* rights. Finally, he contends his statements were not voluntary because they were the product of coercion.

#### 1. *Custodial Interrogation*

A preliminary issue is whether Minor was in custody when he made the statements. A custodial interrogation occurs when " ' " 'a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' " ' " (*People v. Ochoa* (1998) 19 Cal.4th 353, 401.) Courts apply an objective test in deciding whether a person is in custody: "[T]he pertinent inquiry is whether there was ' " 'a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.' " ' " (*People v. Leonard* (2007) 40 Cal.4th 1370, 1400.)

Whether a defendant is in custody is a mixed question of fact and law; we review a trial court's factual findings regarding the circumstances surrounding the interrogation for substantial evidence, and decide independently whether, "given those circumstances, 'a

5

reasonable person in [the] [minor's] position would have felt free to end the questioning and leave.' " (*People v. Leonard*, *supra*, 40 Cal.4th at p. 1400.) Where the facts are undisputed, we review the trial court's determination independently. (*In re Kenneth S.* (2005) 133 Cal.App.4th 54, 64.) The prosecution has the burden of proving a defendant was not in custody. (*In re I.F.* (2018) 20 Cal.App.5th 735, 760 (*I.F.*).)

We consider the totality of the circumstances in determining whether a person is in custody. Pertinent factors include " 'whether contact with law enforcement was initiated by the police or the person interrogated, and if by the police, whether the person voluntarily agreed to an interview; whether the express purpose of the interview was to question the person as a witness or a suspect; where the interview took place; whether police informed the person that he or she was under arrest or in custody; whether they informed the person that he or she was free to terminate the interview and leave at any time and/or whether the person's conduct indicated an awareness of such freedom; whether there were restrictions on the person's freedom of movement during the interview; how long the interrogation lasted; how many police officers participated; whether they dominated and controlled the course of the interrogation; whether they manifested a belief that the person was culpable and they had evidence to prove it; whether the police were aggressive, confrontational, and/or accusatory; whether the police used interrogation techniques to pressure the suspect; and whether the person was arrested at the end of the interrogation. [Citations.] [¶] No one factor is dispositive. Rather, we look at the interplay and combined effect of all the circumstances to determine whether on balance they created a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest." (*I.F.*, *supra*, 20 Cal.App.5th at p. 759.)

Where the person being questioned is a minor, the court may also consider the child's age in the *Miranda* analysis, as long as the child's age was known to the officer or objectively apparent to a reasonable officer, because " 'a reasonable child subjected to police questioning will sometimes feel pressured to submit when a reasonable adult would feel free to go.' " (*I.F.*, *supra*, 20 Cal.App.5th at p. 760, citing *J. D. B. v. North*

6

*Carolina* (2011) 564 U.S. 261, 272, 277 (*J. D. B.*); see *Haley v. Ohio* (1948) 332 U.S. 596, 599 ["That which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens"].)

An example of a noncustodial interview in a suspect's bedroom is found in *People v. Linton* (2013) 56 Cal.4th 1146, 1167 (*Linton*). A detective and a deputy district attorney came to the defendant's home, wearing plain clothes and with no visible weapons. They asked to speak to the defendant, making clear that he did not have to do so and was not under arrest. The defendant invited them into his house and took them into his bedroom. He was not restrained and the interviewers did not block the bedroom exit. All three sat in chairs. The interviewers repeated that the defendant did not have to speak to them and was not under arrest. Their questioning was not aggressive or confrontational. Under these circumstances, our high court ruled, a reasonable person would have understood he was free to stop the interview and ask them to leave. (*Ibid.*)

In this case, there are circumstances consistent with a noncustodial interrogation; for instance, Smith told Minor he was "not under arrest right now"; Smith's tone was calm and nonconfrontational; the interview took place at Minor's home, with Mother present, rather than at a police station; and it lasted barely 20 minutes. (See *In re Kenneth S.*, *supra*, 133 Cal.App.4th at p. 65 [no custody where minor was brought to room only 10 feet from foster mother, with her permission, and door was partially open during interview]; *I.F.*, *supra*, 20 Cal.App.5th at p. 770 [officer's tone in one interview was "professional and appropriate," minor was shown door leading to observation room where his father was watching, and minor was told he was there of his own free will and could walk out any time].)

However, there are also factors suggesting Minor was in custody. No one asked him if he wanted to speak with the police; rather, Mother brought the two officers into Minor's bedroom as he was sleeping. The portion of the body camera video before the questioning began is difficult to understand, but it appears Smith asked, "Is it okay to do it in this room?" and Mother, not Minor, answered, "Yes." Smith then asked Minor for identification. Minor was not told he was free to leave, and nothing in his conduct

7

suggests he thought he could do so. Smith told Minor he was there because the incident had been recorded on video. (See *I.F.*, *supra*, at pp. 771–773 [interview custodial where parent, not minor, agreed to request for interview, officers did not tell minor he was free to terminate interview and leave, and they manifested belief they knew minor was culpable]; see *id*. at pp. 775–776.) The bedroom was small, and it appears that Martinez and Smith stood near the bedroom door throughout the interview. After a few questions about Minor's schooling, Smith began asking him about the incident in question, and repeatedly directed him to verbalize his answers when he nodded or shrugged. The questioning ended with Minor's arrest.

Whether a reasonable 15-year-old in these circumstances would have felt free to end the questioning and leave the room, or have the officers leave, is a close issue. For purposes of our analysis, we assume the juvenile court was correct in finding the interview custodial.

### 2. *Lack of Consultation with Counsel*

Minor contends the juvenile court erred in not taking into account the provisions of section 625.6 when it ruled his statements to police were admissible.

#### a. Enactment of Section 625.6

Section 625.6 went into effect January 1, 2018, less than two months before police questioned Minor in this case. (Senate Bill 395, Stats. 2017, ch. 681, § 2.) Subdivision (a) of that statute provides that, "[p]rior to a custodial interrogation, and before the waiver of any Miranda rights, a youth 15 years of age or younger shall consult with legal counsel in person, by telephone, or by video conference. The consultation may not be waived." Subdivision (b) directs that "[t]he court shall, in adjudicating the admissibility of statements of a youth 15 years of age or younger made during or after a custodial interrogation, consider the effect of failure to comply with subdivision (a)."[2]

---

[2] We grant Minor's request for judicial notice of portions of the legislative history of section 625.6.

In the uncodified portion of Senate Bill 395, the Legislature made findings about its reasons for adding section 625.6. (Stats. 2017, ch. 681, § 1.) It found that "[d]evelopmental and neurological science concludes that the process of cognitive brain development continues into adulthood, and that the human brain undergoes 'dynamic changes throughout adolescence and well into young adulthood,' " and that, as recognized by the United States Supreme Court, children " ' "generally are less mature and responsible than adults" ' "; " 'they "often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them" ' "; " 'they "are more vulnerable or susceptible to . . . outside pressures" than adults' "; "they 'have limited understandings of the criminal justice system and the roles of the institutional actors within it' "; and they " 'characteristically lack the capacity to exercise mature judgment and possess only an incomplete ability to understand the world around them.' " (*Id.*, subd. (a), citing, *inter alia*, *J. D. B.*, *supra*, 564 U.S. 261, and *Graham v. Florida* (2010) 560 U.S. 48.) The Legislature also found that juveniles are less able than adults to understand the meaning of their *Miranda* rights and the consequences of waiving them, that adolescents tend to "ignore or discount future outcomes and implications" and disregard long-term consequences of important decisions, and that juveniles are more vulnerable to "psychologically coercive interrogations" than adults experienced with the criminal justice system. (Stats. 2017, ch. 681, § 1, subd. (b).) For these reasons, the Legislature concluded, "in situations of custodial interrogation and prior to making a waiver of rights under [*Miranda*], youth under 18 years of age should consult with legal counsel to assist in their understanding of their rights and the consequences of waiving those rights." (Stats. 2017, ch. 681, § 1, subd. (c).)

b. Background

The officers did not arrange for Minor to consult with counsel before questioning him. Smith testified that he was aware of section 625.6 at the time he questioned Minor, but that he did not believe Minor was in custody during the interview.

At the hearing on the admissibility of Minor's statements, the juvenile court expressed uncertainty about how to apply section 625.6, subdivision (b)'s directive that it

9

take into account Minor's lack of consultation with an attorney when deciding whether to admit the statements. Minor's counsel argued that this was "a very important factor" to consider in determining whether Minor acted knowingly and voluntarily. Based on its view that evidence could not be suppressed absent a constitutional violation, the court denied the motion to exclude Minor's statements, stating, "I do find that the statements were made voluntarily under the existing case law relating to interrogation before the effective date of Welfare and Institutions Code section 625.6."

      c. Application of Section 625.6

Minor contends the juvenile court misunderstood section 625.6, subdivision (b), which, he argues, directs the court to exercise its discretion to decide whether the lack of an attorney is a factor indicating a youth's inculpatory statements are inadmissible. He asks us to remand the matter for a new hearing to allow the juvenile court to consider this factor.

This contention fails. The "Truth-in-Evidence" provision of the California Constitution provides: "Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding . . . or in any trial or hearing of a juvenile for a criminal offense, whether heard in juvenile or adult court. . . ." (Cal. Const., art. 1, § 28(f)(2).) Under this provision, relevant evidence may be excluded only if exclusion is required by the United States Constitution or a statute enacted by two-thirds of each house of the Legislature. (*In re Lance W.* (1985) 37 Cal.3d 873, 890; *People v. Ratekin* (1989) 212 Cal.App.3d 1165, 1169; see also *People v. Nelson* (2012) 53 Cal.4th 367, 374 (*Nelson*) ["Under California law, issues relating to the suppression of statements made during a custodial interrogation must be reviewed under federal constitutional standards"]; *People v. Guzman* (Dec. 5, 2019, S242244) __ Cal.5th ___ [2019 Cal. LEXIS 8937, *9–*11] [Truth-in-Evidence provision supersedes statutorily-created exclusionary rules].) Section 625.6 did not pass each chamber of the Legislature by a two-thirds margin. (Sen. Bill No. 395 (2017–2018 Reg. Sess.), Assem. Floor vote, Sept. 14, 2017 & Sen. Floor vote, Sept. 15, 2017

10

<http://leginfo.legislature.ca.gov/faces/billVotesClient.xhtml?bill_id=201720180SB395>
[as of December 13, 2019].)

Although no published opinion has addressed the Truth-in-Evidence provision as applied to section 625.6, our high court considered a similar issue in *People v. Lessie* (2010) 47 Cal.4th 1152, 1169 (*Lessie*). The defendant there was 16 years old when he was questioned, and the police did not advise him that he had a right, pursuant to section 627, subdivision (b), to make a telephone call to a parent within an hour of being taken into custody. In affirming the defendant's conviction, the court stated, "The bare violation of section 627 . . . has very limited relevance in the present context. The Legislature has not authorized exclusion as a remedy for such violations, and the Truth-in-Evidence provision (Cal. Const., art. 1, § 28, subd. (f)(2)) bars courts from creating such a remedy under the state Constitution." (*Lessie*, at p. 1170.)

Recognizing this principle, Minor does not argue that section 625.6 mandates suppression of inculpatory statements whenever police fail to ensure a minor consults with an attorney. Rather, he contends Smith's failure to comply with section 625.6 was one of the factors the court should have considered when it ruled on the admissibility of his statements. In considering this contention, we bear in mind our high court's admonition that "the Truth-in-Evidence provision [citation] leaves us with no power to exclude a minor's self-incriminatory statements except as federal law requires." (*Lessie*, *supra*, 47 Cal.4th at p. 1167.) We agree with the juvenile court that a court must apply federal constitutional law, rather than more restrictive standards derived from a state statute that was not passed by a two-thirds majority, in deciding the admissibility of a minor's custodial statements. Section 625.6 does not authorize a court to exercise its discretion to exclude statements if those statements are admissible under federal law.

This conclusion does not mean the policies underlying section 625.6 are irrelevant to whether a minor's statements should be admitted. Both in deciding whether a child properly waived his or her *Miranda* rights and in determining whether the statements were voluntary, a court considers the totality of the circumstances, which may include a minor's youth and lack of sophistication or experience in the criminal justice system.

11

(See, e.g., *Lessie*, *supra*, 47 Cal.4th at pp. 1167, 1169 [waiver of Fifth Amendment rights]; *In re Elias V.* (2015) 237 Cal.App.4th 568, 576 (*Elias V.*) [voluntariness of admissions].)  Crucially, the court must inquire into " '*all the circumstances*' " of an interrogation, including " 'evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.' " (*Lessie*, *supra*, 47 Cal.4th at p. 1167, italics added, quoting *Fare v. Michael C.* (1979) 442 U.S. 707, 725; see *Elias V.*, at p. 576.)  But, as the juvenile court correctly ruled, the proper inquiry remains not whether officers complied with the state statute, but whether federal law compels exclusion of the minor's statements.

We also emphasize that our decision is not intended to neuter section 625.6's requirement that youths of 15 years or younger consult with legal counsel before a custodial interrogation.  Although California's Truth-in-Evidence law does not authorize exclusion of evidence as a remedy for violation of a state statute, nothing we say is intended to suggest that authorities are not bound by section 625.6, that officers need not be trained in its requirements, or that those who violate it should not face administrative or other appropriate consequences.

Bearing these principles in mind, we turn to Minor's substantive challenges to the admission of his statements.

### 3.  *Waiver of* Miranda *Rights*

Minor contends his statements were inadmissible because he did not validly waive his *Miranda* rights.  Accepting as true the trial court's determination of any disputed facts if supported by substantial evidence, we decide this issue independently.  (*Lessie*, *supra*, 47 Cal.4th at p. 1169.)  In so doing, "we inquire 'into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forgo his right to remain silent and to have the assistance of counsel.' " (*Ibid.*)  Where the subject is a child, this inquiry includes evaluation of the factors we have already discussed—the minor's "age, experience, education, background, and intelligence, and . . . whether he has the capacity to understand the warnings given

him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." (*Ibid.*)

Nothing in the record persuades us Minor did not understand his rights to silence and counsel and the consequences of waiving those rights. He was informed of each of his rights and answered in the affirmative without hesitation when asked if he understood them. And he had before him a "Juvenile Know Your Rights" form, which he looked at before Smith began his questioning. Although there is no indication Minor had previously been arrested, he told Smith he had been detained on one occasion. We recognize that Minor was young, only 15 years old. But courts have found waivers of *Miranda* rights by youth 15 years of age and younger. (See, e.g., *Nelson, supra,* 53 Cal.4th at p. 375 [15-year-old defendant]; *People v. Lewis* (2001) 26 Cal.4th 334, 384 [14-year-old defendant]; *In re Brian W.* (1981) 125 Cal.App.3d 590, 593 [15-year-old defendant].) Minor did not expressly waive his *Miranda* rights, in that Smith never asked whether, bearing those rights in mind, Minor wished to speak to him. But a minor may waive *Miranda* "implicitly by willingly answering questions after acknowledging that he understood those rights." (*Lessie*, *supra*, 47 Cal.4th at p. 1169.)

Minor argues that Mother's participation in some way rendered his waiver invalid. He suggests that she had a "conflicted role" because she wanted Minor to cooperate with the police, and that she likely did not understand the significance of waiving *Miranda* rights. Minor relies on *I.F.*, *supra*, 20 Cal.App.5th at pp. 760–761, but that case is distinguishable. The minor there was suspected of killing his own sister; in those circumstances, the court noted, the "grieving parent's search for answers could bring him into conflict with his child." Here there is no such conflict, as Mother was not a victim, or even acquainted with the victim of this crime. Moreover, the question in *I.F.* was whether interviews with a minor were custodial, and we are assuming for purposes of our analysis that Smith's interview with Minor *was* custodial.

Minor also relies on patronizing assumptions about the wisdom and life experience of a single mother who worked as a janitor for a modest wage. We reject this argument on the facts—Mother was rightly concerned that her son was heading down the

13

wrong track—and also because Mother's understanding of *Miranda* is irrelevant. It is Minor who must knowingly and voluntarily waive these rights, as Minor did here.

### 4. *Voluntariness of Minor's Statements*

Minor also contends his statements should not have been admitted because they were the product of coercion.

The use of an involuntary confession in a delinquency proceeding violates a minor's Fourteenth Amendment rights. (*Elias V.*, *supra*, 237 Cal.App.4th at p. 576.) " 'A statement is involuntary if it is not the product of ' "a rational intellect and free will.' " [Citation.] The test for determining whether a confession is voluntary is whether the defendant's "will was overborne at the time he confessed." ' " (*People v. McWhorter* (2009) 47 Cal.4th 318, 346–347; accord *Linton*, *supra*, 56 Cal.4th at p. 1176.) A confession that is obtained through threats or violence, direct or implied promises, or improper influence may be found involuntary. (*McWhorter*, at p. 347.) We look at the totality of the circumstances to determine whether a confession was voluntary, including the characteristics of the accused and the details of the interrogation. (*Ibid*.)

The trial court's factual findings regarding the circumstances of the interrogation are reviewed for substantial evidence, and its determination of whether police activity was coercive is subject to independent review. (*People v. Jones* (1998) 17 Cal.4th 279, 296.) Where, as here, a defendant's statement is recorded in full, we review the voluntariness of the confession independently. (*Linton*, *supra*, 56 Cal.4th at pp. 1176–1177; accord, *People v. Perez* (2016) 243 Cal.App.4th 863, 871.)

Minor relies primarily on *Elias V.*, decided by our colleagues in Division Two of this judicial district. The 13-year-old minor there, Elias, was alleged to have committed a lewd act on a three-year-old girl. (*Elias V.*, *supra*, 237 Cal.App.4th at pp. 570–571.) A detective and two deputy sheriffs came to his school to speak to him, and the principal brought Elias to a small office. (*Id*. at p. 574.) During the questioning, the detective stated as a fact that Elias had touched the victim in a sexual manner; she first suggested he had done so either because he found it exciting or because he was curious. When Elias rejected the first suggestion, the detective said, " '[b]ut you did it,' " and Elias

14

accepted her suggestion that he had touched the victim out of curiosity. (*Id*. at pp. 574–575, 585–586.)

The appellate court in *Elias V.* concluded the interrogation was coercive. It noted the evidence that juveniles are particularly suggestible and at risk of making false confessions. (*Elias V.*, *supra*, 237 Cal.App.4th at p. 578.) It went on to describe a commonly used interrogation method known as the "Reid Technique," in which investigators isolate a suspect in a small private room and employ positive and negative incentives to confess. This " 'maximization/minimization' " technique involves confronting the suspect with accusations of guilt and refusing to accept alibis or denials, while offering moral justifications and face-saving excuses that minimize the crime and lead the suspect to see confession as a means of escape. (*Id*. at p. 579–580, 583.)

On the facts of the case before it, the court found the interrogation of Elias rendered his confession involuntary. The questioning took place at school, with the principal present, rather than in Elias's home with a parent present. (*Elias V.*, *supra*, 237 Cal.App.4th at p. 581.) Although there was only limited evidence that any crime had taken place at all, the detective repeatedly referred to Elias's guilt as an established fact; she told Elias falsely that the victim had explained what had happened " 'perfectly' " and that another witness had seen the lewd conduct; she suggested scenarios involving improper touching, increasing the likelihood that Elias's statements were the result of his suggestibility rather than his own recall of events, and she threatened to subject him to a lie detector test. (*Id*. at pp. 582–584, 591, 593.) She also provided a face-saving excuse—curiosity—for having committed the offense. (*Id*. at pp. 583–586.) Based on Elias's youth, the absence of any evidence corroborating his inculpatory statements, and the likelihood that the detective's use of deception and overbearing tactics would induce untrustworthy admissions, the appellate court concluded the statements were involuntary. (*Id*. at p. 586–587.)

A different panel of this division followed *Elias V.* in *In re T.F.* (2017) 16 Cal.App.5th 202 to find a minor's confession involuntary. The 15-year-old, who was alleged to have committed a lewd act on a child, had a documented intellectual disability.

(*Id.* at pp. 206, 220–221.)  He was interrogated in a small room at his school by two armed police officers for nearly an hour without being given *Miranda* warnings, during which time he repeatedly denied having touched the victim inappropriately, sobbed uncontrollably, and begged the officers to let him return to class or go home.  (*Id.* at pp. 208–209, 221.)  Finally, in response to a question about whether it was " 'a one-time, isolated incident,' " the minor said it was " 'one time,' " before again denying that he touched the victim.  (*Id.* at pp. 208–209.)  He was arrested and taken to a police station, where he was subject to a "nonstop barrage of questions, all insinuating that he had inappropriately touched [the victim] and he should come clean and tell the truth."  (*Id.* at p. 221.)  Finally, in response to more questioning and the suggestion that he might have touched the victim " 'over her pants a little bit,' " the minor admitted having done so.  (*Id.* at p. 209.)

*Elias V.* and *T.F.* are readily distinguishable from the case before us.  None of the circumstances in this case raise a concern that Minor was induced to give a false confession or that his will was overborne through aggressive and suggestive tactics.  Minor was read his *Miranda* rights.  He was questioned at home, with his mother in the room.  Although there was independent evidence both of the assault and of Minor's culpability, Smith did not insist on Minor's guilt in the face of persistent denials.  When asked, Minor immediately admitted doing something he wasn't "supposed to do" by the Safeway store and said he remembered an "old white guy" in a car.  After saying he "forgot" *why* the group reacted as they did, Minor soon said he remembered *what* he and his friends had done, and acknowledged the video would show the incident.  Smith's tone was calm and appropriate throughout.

Minor contends the coercive nature of the questioning is shown by the fact that he had to put on his pants in the presence of Mother and the officers; his bedroom was small and Martinez was between him and the door; Minor spoke in a low, and sometimes barely audible, voice; and at one point he said he did not feel like talking.  He points out that he had only limited experience with law enforcement.  In light of Minor's immediate

acknowledgement that he was involved in the assault, we are not persuaded that these factors show Minor's will was overborne.

Minor also argues that Mother's presence in the room increased the coercive nature of the interrogation, citing *Spano v. New York* (1959) 360 U.S. 315, 323 [officers overcame defendant's will by instructing his childhood friend to make false statements to him] and *Culombe v. Connecticut* (1961) 367 U.S. 568, 630 [officer asked defendant's wife to confront him and tell him to confess].  Again, we disagree.  At one point during the questioning, Smith pressed Minor for the names of the other youths involved in the assault.  Minor said he did not know their names, and Smith told Minor that it was not "smart" to refuse because otherwise Minor would "take the hit for this entire incident," and he suggested Mother would agree with him.  Mother asked Smith whether he had video of the others, and Smith said, "I haven't identified the other kids yet so I need your son to tell me who they are.  So if you want to help him tell me who they are—can you talk to him?"  Mother said Minor's name and, as Minor shook his head, she appeared to encourage him to give Smith the information.  During this time, Minor appeared visibly uncomfortable, fidgeting, scratching himself, and falling back on the bed with his arms outstretched.  But the record belies Minor's contention that this exchange shows his will was overborne; rather than yielding to the questions, he refused to give the names of his friends, and after Minor reiterated that he would not tell Smith who they were, Smith moved on to another line of questioning.  At the end of the interview, Smith asked again for the names of the other people involved, and Minor again refused to give them.

We are also unpersuaded by Minor's reliance on what he characterizes as Smith's deception and trickery.  He suggests that, by asking Minor about his schooling and why he was at home instead of at school, Smith was falsely presenting himself as a father figure who was concerned about Minor's truancy and thereby misrepresented the reason he wanted to speak with Minor.  But after Smith asked Minor about his schooling, he said, "So do you know why I'm here?" and immediately began asking about the incident.  Minor was not deceived about the purpose of the interview.

17

Minor also argues that Smith falsely created an illusion that he knew all about the crime and only needed to verify details. We disagree. The video of the incident, although it lacks sound, shows the group beating the victim after he approached them and appeared to speak angrily; a teacher identified Minor as a possible participant; and Minor acknowledged the incident as soon as Smith asked him if he remembered it. There is no reason to conclude Minor's will was overborne by deception or trickery. The juvenile court properly admitted his statements.

## B. Vague Probation Condition

One of the conditions of Minor's probation required him to "[c]onsult with the Probation Officer without hesitation when you are in need of advice." Minor contends this condition is unconstitutionally vague and infringes on his right to privacy. We review this claim de novo. (*In re Shaun R.* (2010) 188 Cal.App.4th 1129, 1143.) Although Minor did not object to the condition below, his facial constitutional claim is not forfeited. (*Ibid.*)

It is well established that "[a] probation condition 'must be sufficiently precise for the probationer to know what is required of him, and for the court to determine whether the condition has been violated,' if it is to withstand a challenge on the ground of vagueness." (*In re Sheena K.* (2007) 40 Cal.4th 875, 890.) Minor contends, and the Attorney General concedes, that the condition requiring him to consult with his probation officer when he is in need of advice violates this standard. We accept the concession. The condition makes clear neither what is meant by "in need of advice" nor what subjects are encompassed by the order. Indeed, read literally, the condition could be construed to require Minor to consult with his probation officer about topics unrelated to his criminal activity or rehabilitation, such as minor academic questions, medical concerns, or romantic matters. It is highly unlikely that this was the juvenile court's intent, and Minor is left to guess what the order requires him to do.

Minor asks us to strike the condition. The Attorney General, on the other hand, urges us either to modify the condition ourselves or remand the matter to the juvenile court for further clarification. We are guided by *In re P.O.* (2016) 246 Cal.App.4th 288,

18

292, in which our colleagues in Division One of this appellate district considered a vagueness challenge to probation conditions that required the minor to " 'be of good behavior and perform well' " at school or work and to " 'be of good citizenship and good conduct.' " Rather than modifying the conditions or remanding to the juvenile court to decide whether to strike or modify them, our colleagues concluded the best course was "to strike all the challenged language, leaving the court free to impose, if it wishes, substitute conditions that are sufficiently clear to comply with constitutional requirements." (*Id*. at p. 299; accord *People v. Perez* (2009) 176 Cal.App.4th 380, 386 [striking overbroad condition and providing trial court may impose narrower condition if necessary].) The same result is appropriate here.

Finally, we have no reason to anticipate that any new condition will intrude impermissibly on Minor's privacy interests, but he remains free to raise any appropriate objection to a substitute condition on remand.

## III. DISPOSITION

We strike probation condition 7, which requires Minor to consult with his probation officer without hesitation when he is in need of advice, and remand the matter to the juvenile court, which remains free to impose a substitute condition that is sufficiently clear to comply with constitutional requirements. In all other respects, the judgment is affirmed.

_____
TUCHER, J.

WE CONCUR:


_____
POLLAK, P. J.


_____
BROWN, J.

Trial Court:                        City and County of San Francisco Superior Court

Trial Judge:                        Hon. Michael Begert

Counsel for Appellant:              Leila H. Moncharsh, by Court-Appointment under the
                                    First District Appellate Project

Counsel for Respondents:            Xavier Becerra, Attorney General; Jeffrey M.
                                    Laurence, Senior Assistant Attorney General; Donna
                                    M. Provenzano, Supervising Deputy Attorney General;
                                    Melissa A. Meth, Deputy Attorney General